**UNITED STATES of America, Appellee,**

v.

**Talal H. ALZANKI, Defendant, Appellant.**

**No. 94–1645.**

United States Court of Appeals,
First Circuit.

Heard Nov. 8, 1994.

Decided June 1, 1995.

Michael A. Collora, with whom David A. Bunis and Dwyer & Collora, Boston, MA, were on brief, for appellant.

S. Theodore Merritt, Asst. U.S. Atty., with whom Deval L. Patrick, Asst. Atty. Gen., Donald K. Stern, U.S. Atty., Boston, MA, and Steven M. Dettelbach, Trial Atty., U.S. Dept. of Justice, Washington, DC, were on brief, for appellee.

Before SELYA, CYR and STAHL, Circuit Judges.

CYR, Circuit Judge.

Defendant Talal H. Alzanki appeals from a district court judgment convicting and sentencing him under 18 U.S.C. §§ 371 and 1584, for holding a household employee in involuntary servitude. We affirm.

## I

### BACKGROUND [1]

At the end of the Gulf War, Vasantha Katudeniye Gedara ("Gedara"), a native of

---

1. The facts are related in the light most favorable to the verdicts. *See United States v. Tejeda,* 974 F.2d 210, 212 (1st Cir.1992).

Sri Lanka, was employed by appellant Talal Alzanki's family for a brief time as a domestic servant in their Kuwaiti residence. The Alzanki family prevented Gedara from leaving their residence, by retaining her passport and warning her that she would be subject to arrest and physical abuse by the Kuwaiti police should she venture outside. Gedara was informed that she soon would be sent to the United States to work for appellant Talal Alzanki and his wife, Abair, at a monthly salary of $250, which was reduced to $120 before she departed Kuwait.

Immediately upon her arrival at appellant's apartment in Quincy, Massachusetts, on August 28, 1992, Gedara's passport was confiscated by appellant, who told her that she was not to leave the apartment alone. She was not permitted to use the telephone or the mails, speak with anyone other than the Alzankis, nor even to venture onto the balcony or look out the apartment windows. Appellant told Gedara that the American police, as well as the neighbors, would shoot undocumented aliens who ventured out alone.

During the four months she remained in the apartment, Gedara was assaulted twice. On one occasion, when Gedara asked that the volume be turned down on the television while she was trying to sleep, appellant grabbed and threw her bodily against the wall. On another occasion, Abair Alzanki slapped Gedara and spat in her face when she failed to turn off a monitor.

The Alzankis deliberately risked Gedara's health by compelling her to work fifteen hours a day at hard, repetitive tasks. She was required to clean the apartment on a constant basis with caustic and noxious chemicals, without the benefit of respiratory protection, and her requests for rubber gloves were refused. Later, after the noxious fumes caused Gedara to faint, fall, and injure her ribs, the Alzankis withheld medical treatment. They also refused to let Gedara have dental treatment for an abscessed tooth.

Finally, though affluent, the Alzankis denied Gedara adequate food, which resulted in serious symptoms of malnourishment, including enlarged abdomen, massive hair loss, and cessation of menstrual cycles. She was provided with only two housecoats to wear and allowed to sleep and sit only on the floor. Once, after Gedara accidentally broke a humidifier, the Alzankis threatened to withhold all her wages.

In addition to the physical abuse and inhumane treatment, Gedara was threatened—on almost a daily basis—with deportation, death or serious harm should she disobey the Alzankis' orders. On numerous occasions, the Alzankis threatened to deport her to Kuwait, and not allow her to return to Sri Lanka. Appellant threatened to kill her if the Alzankis' newborn child—suffering from spina bifida—were to die while appellant was away in New York. The climate of fear was enhanced by Gedara's witnessing one incident involving Talal Alzanki's physical abuse of Abair, and by learning from Abair that he had struck Abair again shortly thereafter. On another occasion, Abair Alzanki threatened to sew up Gedara's mouth with a needle and thread, and throw her into the ocean.

On December 17, 1992, after confiding her plight to nurses who came to the apartment to care for the Alzankis' sick child, Gedara fled the apartment and reported her ordeal to the local police. Appellant later complained to the police that Gedara should be returned, because she "belonged to him" and "he had a contract for her."

A federal grand jury returned a two-count indictment, charging the Alzankis with conspiring to hold, and holding, Gedara in involuntary servitude, in violation of 18 U.S.C. §§ 371 and 1584. At trial, the Alzankis testified in their own behalf; Gedara testified for the prosecution. Due to a medical emergency, a mistrial was declared as to Abair Alzanki, prior to her cross-examination. The government nonetheless agreed to permit her direct testimony to remain in evidence. The jury returned guilty verdicts against Talal Alzanki on both counts. The district court sentenced him to one year and one day, which represented a downward departure from the 18–to–24 month guideline sentencing range, and to a modest restitutionary sentence.

## II

### DISCUSSION

Appellant challenges certain jury instructions; the sufficiency of the evidence sup-

porting both convictions; various evidentiary rulings; the government's closing argument; and the $13,403.00 restitutionary sentence imposed by the district court.

### A. The Scope of the Involuntary Servitude Statute

Section 1584 proscribes involuntary servitude.[2] It is not to be read so narrowly as to pose Thirteenth Amendment problems. *United States v. Kozminski,* 487 U.S. 931, 945, 108 S.Ct. 2751, 2761, 101 L.Ed.2d 788 (1988) ("Congress' use of the constitutional language in a statute enacted pursuant to its constitutional authority to enforce the Thirteenth Amendment guarantee makes the conclusion that Congress intended the phrase to have the same meaning in both places logical, if not inevitable. In the absence of any contrary indications, we therefore give effect to congressional intent by construing 'involuntary servitude' in a way consistent with the understanding of the Thirteenth Amendment that prevailed at the time of § 1584's enactment."); *see also United States v. Booker,* 655 F.2d 562, 564–65 (4th Cir.1981); *United States v. Shackney,* 333 F.2d 475, 481–86 (2d Cir.1964).[3] The government need not prove physical restraint. *See, e.g., United States v. King,* 840 F.2d 1276, 1278–79 (6th Cir.1988) (upholding cult leaders' convictions for holding occupants in involuntary servitude, despite absence of fencing or other physical barriers); *United States v. Warren,* 772 F.2d 827–33 (11th Cir. 1985) (upholding involuntary servitude conviction even though victim had opportunity to escape), *cert. denied,* 475 U.S. 1022, 106 S.Ct. 1214, 89 L.Ed.2d 326 (1986); *United States v. Bibbs,* 564 F.2d 1165, 1167 (5th Cir.) (recognizing that various forms of physical *force* and/or *threats* of violence may establish requisite coercion), *cert. denied,* 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978).

Absent proof of physical restraint, a finding of involuntary servitude is not warranted, however, unless the government establishes that the victim could only extricate herself by risking "imprisonment or worse." *Shackney,* 333 F.2d at 486. Thus, compulsion is an essential element of involuntary servitude under section 1584. *See Flood v. Kuhn,* 316 F.Supp. 271, 281 (S.D.N.Y.1970), *aff'd,* 443 F.2d 264 (2d Cir.1971), *aff'd,* 407 U.S. 258, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972). In sum, the requisite compulsion under section 1584 obtains when an individual, through an actual or threatened use of physical *or* legal coercion, intentionally causes the oppressed person reasonably to believe, given her "special vulnerabilities," that she has no alternative but to remain in involuntary service for a time. *See Kozminski,* 487 U.S. at 952–53, 108 S.Ct. at 2764–65; *United States v. Mussry,* 726 F.2d 1448, 1451–52 (9th Cir.), *cert. denied, Singman v. United States,* 469 U.S. 855, 105 S.Ct. 180, 83 L.Ed.2d 114 (1984).

A sustainable conviction under section 1584 therefore requires sufficient evidence to enable a finding, *inter alia,* that the defendant used *or* threatened physical restraint, bodily harm *or* legal coercion. *Kozminski,* 487 U.S. at 952, 108 S.Ct. at 2765 ("*This definition encompasses those cases in which the defendant holds the victim in servitude by placing the victim in fear of such physical restraint or injury or legal coercion.*") (emphasis added). Moreover, in assessing whether the government has succeeded in establishing the requisite compulsion, the jury is to consider the victim's "special vulnerabilities," with a view to "whether the physical or legal coercion or

2. At the time of the offense, the statute provided: Whoever knowingly and willfully holds to involuntary servitude or sells into any condition of involuntary servitude, any other person for any term, or brings within the United States any person so held, shall be fined not more than $5,000 or imprisoned not more than five years, or both.
 18 U.S.C. § 1584 (1992).

3. Most peonage and involuntary servitude cases in recent years have involved migrant agricultural workers. *See, e.g., Kozminski,* 487 U.S. 931, 108 S.Ct. 2751, 101 L.Ed.2d 788 (dairy farm workers); *United States v. Harris,* 701 F.2d 1095, 1098 (4th Cir.1983) (migrant truck-farm workers), *cert. denied,* 463 U.S. 1214, 103 S.Ct. 3554, 77 L.Ed.2d 1400 (1983); *Booker,* 655 F.2d 562 (migrant farm-labor camp); *United States v. Bibbs,* 564 F.2d 1165, 1167 (5th Cir.1977) (fruit harvesting crews), *cert. denied,* 435 U.S. 1007, 98 S.Ct. 1877, 56 L.Ed.2d 388 (1978); *Shackney,* 333 F.2d 475 (chicken-farm workers).

threats thereof could plausibly have compelled the victim to serve [against her will]." *Id.*[4] In other words, conviction under section 1584 is precluded absent proof, *inter alia,* that the victim was intentionally held in service against her will (i) by actual physical restraint or physical force or (ii) by legal coercion or (iii) by plausible threats of physical harm or legal coercion.

## B. *Jury Instructions*

■ We review the challenged jury instructions against the backdrop of the entire charge, *see United States v. Tutiven,* 40 F.3d 1, 8 (1st Cir.1994) (citing *United States v. Serino,* 835 F.2d 924, 930 (1st Cir.1987)), *cert. denied,* —— U.S. ——, 115 S.Ct. 1391, 131 L.Ed.2d 243 (1995), focusing our inquiry on whether the instructions adequately explained the law or " 'whether they tended to confuse or mislead the jury on the controlling issues.' " *Brown v. Trustees of Boston Univ.,* 891 F.2d 337, 353 (1st Cir.1989) (citation omitted), *cert. denied,* 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990).

### 1. *The Instruction on Involuntary Servitude*

■ Appellant asserts three challenges to the jury instruction defining the substantive offense of involuntary servitude. First, he argues that the court misled the jury into believing that psychological pressure alone could establish the requisite element of compulsion, by defining "physical force" as encompassing "the notion of compulsion, coercion, power, violence." The district court's instruction stated:

[T]he government has to prove that the defendant held Ms. Gedara in involuntary servitude by using or threatening physical force, or using or threatening legal coercion.

Physical force includes restraint, physical restraint, locking somebody up, or in some other way restraining the person. It includes physically injuring the person. It includes the notion of compulsion, coercion, *power,* violence. And the government has to prove that the defendant held or participated in holding Ms. Gedara by using physical force, or by threatening to use physical force.

(Emphasis added.) Appellant theorizes that the jury may have misinterpreted the term "power," in light of the expert testimony proffered by the government, *see infra* Section II.D.1, that "[a]n unequal power relationship is where there is a subordinate and a dominant person. It is generally defined by the authority person, and it is unequal because of that authority relationship that exists between the two parties."

The argument is without merit. The challenged instruction, viewed against the backdrop of the entire charge, *see Tutiven,* 40 F.3d at 8, left no doubt whatever that psychological pressure alone would not satisfy the "force or threat" element of the involuntary servitude offense.[5]

■ Second, appellant claims that the district court failed to instruct the jury that any fear engendered in Gedara must be shown to have been "reasonable." But, in fact, the court instructed the jury to decide "whether the service was involuntary[ ] [and]

---

4. The *Kozminski* Court elaborated on the evidentiary role of the victim's "special vulnerabilities":

[A] child who is told he can go home late at night in the dark through a strange area may be subject to physical coercion that results in his staying, although a competent adult plainly would not be. Similarly, it is possible that threatening an incompetent with institutionalization or an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude, even though such a threat made to an adult citizen of normal intelligence would be too implausible to produce involuntary servitude.

487 U.S. at 948, 108 S.Ct. at 2762–63.

5. In the final jury charge, the trial judge provided unmistakably clear guidance against any such misunderstanding: "But [Talal Alzanki] *cannot be convicted* if you find he used only psychological means to compel her, if he played mind games with her. *That's not enough.* The government does have to prove that he used . . . or threatened physical or legal coercion."

Moreover, the preliminary jury instructions explained: "Now, involuntary servitude . . . means a condition of servitude in which the victim is forced to work for the defendant by the *use or threat of physical restraint or physical injury or by the use or threat of coercion through law or legal process.*"

whether Ms. Gedara *reasonably believed* that she had no choice except to remain in the service of the Alzankis." The district court's references to subjective considerations, such as "whether [Gedara] was personally in fear of physical or other means of coercion," occurred in the course of its discussion of the types of *evidence* the jury could weigh in deciding whether Gedara's *belief*—that she had no other choice—*was reasonable. See also infra* note 6. The trial judge assuredly did not suggest that a mere finding that Gedara harbored fears—however unreasonably—was enough to establish compulsion under section 1584. It was entirely proper to instruct the jury to consider Gedara's background and experience in assessing whether her fears were reasonable.[6]

▪ The final instructional challenge relates to an uncertified transcript of the jury charge—containing a clerical error—made available to the jury during its deliberations. The transcript mistakenly stated: "The government does *not* have to prove that [Alzanki] used, ... or threatened physical or legal coercion." Thus, there can be no question that the transcript misstated an essential element of the crime charged.

The jury had been deliberating for seven hours by the time it requested the transcript *for the explicit purpose of reviewing witness testimony.*[7] Thus, there is but a remote possibility that the jury *even consulted the portion of the transcript containing the typographical error.* Furthermore, even assuming the jury consulted the relevant portion of

the transcript, it is virtually inconceivable that it would have credited this lone typographical error over four correctly transcribed statements, and the five correct oral statements it had been given in the courtroom earlier, especially since the transcript itself alerted the jury with the imprint: "Rough Draft–Not Certified." *Cf. United States v. DeMasi,* 40 F.3d 1306, 1317–1318 (1st Cir.1994) ("Our review of the instructions reveals that the district court referred to the 'beyond a reasonable doubt' standard no less than twelve times in the nine pages of jury instructions preceding the isolated section challenged here. This overwhelming number of correct references negated any chance that the contested statements were misconstrued by the jury as somehow reducing the government's burden of proof"), *cert. denied, Bonasia v. United States,* —— U.S. ——, 115 S.Ct. 947, 130 L.Ed.2d 890 (1995); *United States v. Glenn,* 828 F.2d 855, 861 (1st Cir.1987) ("This [challenged] phrase [in the jury instructions] ... 'may not be judged in artificial isolation, but must be viewed in the context of the overall charge.'") (quoting *United States v. DeVincent,* 632 F.2d 147, 152 (1st Cir.), *cert. denied,* 449 U.S. 986, 101 S.Ct. 405, 66 L.Ed.2d 249 (1980)).[8]

Given the fact that the trial judge correctly and repeatedly explained this element to the jury earlier in the courtroom, and absent any indication that the jury even noted, let alone credited, the isolated misstatement in the transcript, we find no prejudice. *Cf. United*

---

6. Similarly, appellant suggests that the jury instruction invited the impression that "extremely poor working conditions and/or special vulnerabilities of the servant" might serve as a proxy for actual or threatened use of physical force or legal coercion. However, the trial judge correctly instructed the jury that

> [the charged offense, involuntary servitude,] encompasses situations in which one person holds another in servitude by placing that person in *fear* of such physical restraint or injury or legal coercion. *It may be shown by evidence* of extremely poor working conditions and/or special vulnerabilities of the servant.

In addition, the jury received proper instructions on the roles of "legal coercion" and "physical coercion":

> [Legal coercion] simply means the use of the law, the legal process, or legal institutions to

compel service. The question here that you will need to determine is: Did the government prove beyond a reasonable doubt that the defendant used or threatened physical or legal coercion to compel Ms. Gedara's service in the household?

Of course, the jury is presumed to have followed the instructions. *Tutiven,* 40 F.3d at 7 (citing *Yates v. Evatt,* 500 U.S. 391, 403–04, 111 S.Ct. 1884, 1892–93, 114 L.Ed.2d 432 (1991)).

7. Despite the government's recommendation that the transcript be proofread, the defense suggested that it be submitted to the jury prior to proofreading or certification by the court reporter.

8. The "force or threat" element was described correctly in the preliminary jury instructions as well. *See supra* note 5.

*States v. Griley,* 814 F.2d 967, 975 (4th Cir. 1987) (where deliberating jury received tape recording of jury instructions at defendant's criminal trial, *as well as* instructions given in unrelated civil case, conviction upheld on grounds that appellant failed to demonstrate prejudice and trial court gave proper curative instruction); *United States v. North,* 746 F.2d 627, 631–32 (9th Cir.) (affirming conviction even though a search warrant affidavit, excluded from evidence, was sent to jury room by mistake; finding "no reasonable possibility that [the warrant] could have affected the verdict"), *cert. denied,* 470 U.S. 1058, 105 S.Ct. 1773, 84 L.Ed.2d 832 (1985), *overruled on other grounds, Jacobson v. United States,* 503 U.S. 540, 112 S.Ct. 1535, 118 L.Ed.2d 174 (1992). There was no reversible error.

### 2. *The Conspiracy Instruction*

Appellant claims that the district court incorrectly instructed the jury on an essential element of the conspiracy charge, by stating that he could be found guilty even if his only alleged coconspirator, Abair Alzanki, involuntarily cooperated under duress. Apparently unclear on this point, the jury later requested further instructions: "[I]s there a conspiracy if the second person [the wife] ... joined the agreement not voluntarily but in fear?" The trial judge instructed:

> The answer is yes. If she agreed with him to do an act that is unlawful, the first element, an agreement, is satisfied. You must, however, then go on and consider the second element, and determine whether [the husband, Talal Alzanki], the only person who is a defendant before you, joined into that agreement knowingly and willfully as I have defined it to you.

■■■■■■ Appellant correctly asserts that a viable conspiracy charge under 18 U.S.C. § 371 requires at least two conspirators, each possessed of the requisite criminal intent. *See, e.g., United States v. Penagaricano-Soler,* 911 F.2d 833, 841 (1st Cir.1990). He argues that his wife could not have been the indispensable *second* willing party, because he coerced her into participating. For the latter proposition, he relies on cases which hold that a conspiracy charge will not lie if the putative coconspirator turned out to be an undercover law enforcement agent. *See, e.g., United States v. Nason,* 9 F.3d 155, 161 & n. 2 (1st Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1331, 127 L.Ed.2d 678 (1994).

■■■■■ As the present claim is raised for the first time on appeal, we review only for plain error. *DeMasi,* 40 F.3d at 1318; *United States v. Griffin,* 818 F.2d 97, 100 (1st Cir.), *cert. denied,* 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987). The burden therefore rests with appellant to establish that the error was "clear," in the sense that it was "obvious," that it affected "substantial rights," and that failure to vacate the conspiracy conviction would result in a "miscarriage of justice." *United States v. Olano,* — U.S. ——, ——–——, 113 S.Ct. 1770, 1776–79, 123 L.Ed.2d 508 (1993).

■■■■ We note at the outset that a "generalized fear" of harm would not have afforded *Abair* Alzanki a viable defense to the conspiracy charge. *See, e.g., United States v. Stevens,* 985 F.2d 1175, 1182 (2d Cir.1993) (district court properly rejected request to instruct jury that generalized fear of harm, without more, would compel acquittal). Moreover, neither defendant contended at trial that Abair Alzanki conformed her will or behavior in response to duress. Indeed, nothing in the trial record intimates a causal link between Talal Alzanki's abusive behavior and Abair's participation in the conspiracy. *Cf. Slater v. United States,* 562 F.2d 58, 62 (1st Cir.1976) (defendant convicted of Kickback Act violation, an essential element of which is the intimidation of others, was properly convicted as well of *conspiring* with those whom he intimidated). Thus, the district court correctly advised the jury that the appropriate inquiry was whether *Talal* Alzanki "joined ... that agreement knowingly and willfully." As the evidence plainly supported such a finding, there was no error, let alone plain error.

### C. *Sufficiency of the Evidence*

■■■ Appellant next contends that the evidence was insufficient to convict on the substantive "involuntary servitude" charge. We review "the evidence in the light most favor-

able to the verdict, in order to determine whether a rational trier of fact could have found guilt beyond a reasonable doubt. All reasonable inferences are drawn in favor of the verdict and any credibility determination must be compatible with the judgment of conviction." *United States v. Tuesta–Toro,* 29 F.3d 771, 776 (1st Cir.1994) (quoting *United States v. Tejeda,* 974 F.2d 210, 212 (1st Cir.1992)), *cert. denied,* —— U.S. ——, 115 S.Ct. 947, 130 L.Ed.2d 890 (1995). There was ample evidence to enable a rational jury to find, beyond a reasonable doubt, each essential element of the substantive offense.

Appellant argues that the record discloses only a few isolated instances in which any physical force whatever was used against Gedara. These incidents, he argues, did not approach, either in frequency or severity, *but see supra* p. 3, the level of physical abuse present in the typical involuntary servitude case. Furthermore, he says, conditions in the Alzanki apartment were neither squalid nor jail-like; whereas in the typical involuntary servitude case, the victim is exposed to severe physical abuse, as well as confinement in extremely uncomfortable quarters. *See, e.g., United States v. Kozminski,* 821 F.2d 1186, 1188–89 (6th Cir.1987) (squalid lodgings, without plumbing; rotten food; numerous instances of slapping, choking, kicking), *aff'd,* 487 U.S. 931, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988); *United States v. Harris,* 701 F.2d 1095, 1098 (4th Cir.1983) (beatings with a rubber hose and confinement to quarters ("the jail") in retaliation for attempted escape), *cert. denied,* 463 U.S. 1214, 103 S.Ct. 3554, 77 L.Ed.2d 1400 (1983); *Booker,* 655 F.2d at 565–66 (numerous retaliatory beatings following escape attempts); *Bibbs,* 564 F.2d at 1167 (holding victims at gunpoint; beating and threatening to kill any who attempted escape).

Gedara testified that during her four-month ordeal in their apartment she was physically assaulted by the Alzankis on two occasions and contemporaneously informed that their purpose was to keep her "in her place." The physical violence appellant directed at Gedara was by no means trifling in degree. The evidence revealed that appellant punished Gedara—merely for asking him to turn down the television—by throwing her bodily against the wall. Moreover, she was kept in a serious state of malnutrition, deprived of medical care, and subjected to threats of deportation, physical harm and even death. Given her experience as a domestic servant in Kuwait, *see supra* p. 2,[9] and in the Alzanki apartment in Quincy, the jury was entitled to infer that Gedara reasonably believed these threats.

■ Appellant correctly asserts that the requisite "compulsion" is not established in circumstances where an available alternative to continued service is merely "exceedingly bad." *See Kozminski,* 487 U.S. at 938, 108 S.Ct. at 2757 (quoting *Shackney,* 333 F.2d at 486). Instead, the evidence must establish that the victim reasonably believed she was left with no alternative to continued servitude that was not the equivalent of "imprisonment or worse." *Shackney,* 333 F.2d at 486. *See, e.g., Steirer v. Bethlehem Area Sch. Dist.,* 987 F.2d 989, 1000 (3d Cir.) (community service requirement for high school graduation not a form of involuntary servitude, as student has choice of foregoing graduation) (citing *Shackney,* 333 F.2d at 486), *cert. denied,* —— U.S. ——, 114 S.Ct. 85, 126 L.Ed.2d 53 (1993).

The evidence that Gedara herself was well aware of the severely restrictive conditions encountered by household servants in Kuwait would enable the jury rationally to conclude that Gedara—threatened with deportation to Kuwait and no prospect of returning to Sri Lanka and her family—confronted an alternative to continued involuntary service which she reasonably considered at least as severe as imprisonment, particularly when viewed in

---

**9.** Gedara testified to her understanding of Kuwaiti police practices toward household servants:

Q. Ms. Gedara, what was your state of mind regarding the police in Kuwait?

A. I heard if we go alone out in the street, they're going to catch us and hit [us] and put into jail.

She testified that she believed that the American police would treat her much the same way were she to venture outside the Alzanki apartment.

light of her "special vulnerabilities."[10] Moreover, the reasonableness of her fear of deportation was substantiated by the undisputed evidence that she would become deportable immediately upon loss of her "B–1" visa status, which allowed her lawfully to remain in the United States only while in the employ of the Alzankis. *See* 8 U.S.C. § 1184(a)(1) ("[U]pon failure to maintain the status under which [s]he was admitted, . . . such alien will depart from the United States."); 22 C.F.R. § 41.31.

Although the defense presented contrary testimony, the jury fairly could infer that the most efficacious threats are those the victim reasonably believes can be carried out. *Shackney*, 333 F.2d at 486–87. *Cf. Booker*, 655 F.2d 562 (threats, substantiated by severe beatings and assaults with firearms, coerced abductees into remaining at labor camp). The jury was entitled to make its own credibility determinations, *Tuesta–Toro*, 29 F.3d at 776, and to find, beyond a reasonable doubt, that Gedara believed appellant's deportation threats to be plausible and that the alternative to continued involuntary servitude was at least as severe as imprisonment.

### D. *Evidentiary Rulings*

#### 1. *The "victimologist" testimony*

Appellant filed an unsuccessful motion *in limine* to preclude the government from calling Ann Burgess, a "victimologist," as an expert witness. At trial, the government used Burgess to refute the Alzankis' principal "defense"; *viz.*, that Gedara often ventured outside their *unlocked* apartment during her alleged involuntary servitude, and given the normal human instinct for self-preservation, one would expect an unrestrained person faced with actual or threatened physical abuse to flee from her abuser at the first opportunity. Burgess countered this evidence with testimony that abuse victims often harbor the opposite impulse— overwhelmed by fear they remain with their abusers.

Appellant contends that Burgess's expert qualifications related only to *sexual* abuse victimology, not the behavioral responses of domestic workers subjected to involuntary servitude. Thus, appellant argues, the expert testimony presented by Burgess was irrelevant and unhelpful to the jury, *see* Fed. R.Evid. 104(a), 702 (permitting use of expert testimony "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact") or, at the very least, its minimal probative value was substantially outweighed by the danger of unfair prejudice, *see* Fed. R.Evid. 403. Finally, appellant argues that the jury was swayed by Burgess's professional credentials, and her testimony amounted to impermissible "bolstering" of the allegations of abuse made by Gedara.

 We review challenges to expert-witness qualification only for manifest abuse of discretion. *See, e.g., United States v. Sepulveda*, 15 F.3d 1161, 1183 (1st Cir.1993), *cert. denied*, ── U.S. ──, 114 S.Ct. 2714, 129 L.Ed.2d 840 (1994); *United States v. Echeverri*, 982 F.2d 675, 677 (1st Cir.1993).[11] The "gatekeeping function" contemplated by Rule 702 essentially requires the trial judge to assess whether it is *"reasonably likely"* that the expert possesses specialized knowledge which will assist the trier better to understand a fact in issue." *Sepulveda*, 15

---

**10.** Evidence of other threats and warnings provided further support for the verdict. These included warnings that the American police would shoot Gedara if she left the apartment alone. Though such a prospect might not have seemed credible to a competent adult American, the "special vulnerabilities" of the victim must be taken into consideration. *See Kozminski*, 487 U.S. at 948, 956, 108 S.Ct. at 2762, 2766. To a foreign worker familiar with Kuwaiti customs and practices (for example, at trial there was evidence that Kuwaiti soldiers manned checkpoints to enforce restrictions on noncitizen movement, especially household servants), a threat of deportation in these circumstances

plausibly may equate with imprisonment. *See supra* note 9.

**11.** We reject the government's contention that the Rule 702 claim should be reviewed only for plain error, since only Abair Alzanki objected at trial. *See United States v. Reed*, 977 F.2d 14, 16 (1st Cir.1992) (motion in limine must be "renewed" by timely objection at trial). At the outset, the trial judge announced that an objection by either defendant would preserve the claim for both. *See, e.g., Sepulveda*, 15 F.3d at 1180 (noting practice as common protocol).

F.3d at 1183 (citing *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)) (emphasis added); *Apostol v. United States,* 838 F.2d 595, 599 (1st Cir.1988) (noting that Rule 702 rulings invite a "case-specific inquiry"). We find no error.

 ■ The central fallacy in appellant's claim is its implicit assumption that no one other than an "involuntary servitude" victimologist could have qualified as an expert under Rule 702 in the present case. This thesis obviously focuses *only* on the "specialized knowledge" requirement under Rule 702, to the total *exclusion* of the *ultimate* standard for admission—whether the "specialized knowledge" possessed by the witness "will *assist* the trier of fact to understand the evidence or to determine a fact in issue...." Fed.R.Evid. 702. It is one matter to acknowledge that a witness steeped in the behavioral reactions of Sri Lankan domestic servants abused by Kuwaiti nationals in the United States could be instructive (if not inordinately so) to a jury. It is quite another to suggest that it is not "reasonably likely," *see Echeverri,* 982 F.2d at 677, that a somewhat less specialized victimologist might "assist" a generalist factfinder in assessing evidence of the exceedingly uncommon phenomenon of domestic servant abuse in the present-day United States. *Id.* at 783 (Rule 702 demands "common sense inquiry"). While the more generalized nature of the proffered testimony may temper its probative value to the factfinder, we do not think it can be said that its relevance is negated entirely.[12]

 ■ The record reflects that the trial judge carefully evaluated Ms. Burgess's professional qualifications following a lengthy voir dire. Burgess testified that her principal training and experience related to victims

of sexual abuse, but that she had researched comparable clinical behavior manifested by victims of physical abuse of a non-sexual nature in so-called "unequal power" relationships (*e.g.,* battered spouses and children). Based on her general research and her personal interaction with hundreds of victims of sexual abuse, Burgess testified that Gedara's behavioral response to the non-sexual abuse administered by the Alzankis was *consistent with the behavior of abuse victims generally.* It seems to us that expert testimony on this subject—which the defense was free to contradict—was "reasonably likely" to assist the jury in understanding and assessing the evidence, in that the matter at issue was highly material, somewhat technical, and beyond the realm of acquired knowledge normally possessed by lay jurors.

 ■ Finally, appellant cites no federal case law for the contention that allowing an expert to testify to her empirical findings on the behavioral reactions of abuse victims impermissibly suggests to the jury that the putative victim's allegations of abuse should be believed. The overwhelming weight of authority suggests otherwise. *See, e.g., United States v. Hadley,* 918 F.2d 848, 852 (9th Cir.1990) (upholding admission of expert testimony by child psychiatrist as to "general behavior characteristics that may be exhibited in children who have been sexually abused"), *cert. dismissed,* —— U.S. ——, 113 S.Ct. 486, 121 L.Ed.2d 324 (1992); *Server v. Mizell,* 902 F.2d 611, 615 (7th Cir.1990); *United States v. Pierre,* 812 F.2d 417, 419 (8th Cir.1987). Moreover, the able trial judge left no room for doubting that the jury remained perfectly free to reject Burgess's expert opinion, as well as its predicate assumption.[13]

---

**12.** The rationale for the trial judge's ruling was much the same:

 It seems ... that one doesn't have to be so specialized as to be an expert on the response of a slavery victim to the master rather than a victim of other kinds of abuse of power in unequal relationships.

**13.** The judge firmly cautioned the jury immediately before Burgess testified:

 The witness who is about to testify is what we call an expert witness. She does not know

what occurred at the Alzanki household. She wasn't there, she didn't see any of that.... [O]ne of the ways in which witnesses are very often examined, expert witnesses are very often examined, is that they are asked to make certain assumptions ... that have to do with the facts in the case.... [I]f the facts are different from the assumptions, then the opinions based on the assumption are of *absolutely no value to you.*

### 2. *"Other Acts" Evidence (Rule 404(b))*

 Appellant next contends that the district court erred in admitting Gedara's testimony concerning appellant's abusive behavior toward his wife, Abair Alzanki, because Rule 404(b) absolutely bars "other acts" evidence relevant only to prove criminal propensity or bad character. *See Tuesta–Toro*, 29 F.3d at 775. We disagree.

 The Rule 404(b) bar is not implicated unless the challenged "other crimes, wrongs, or acts are relevant *exclusively* to instigate an inference that the defendant is more likely to have acted in similar fashion by committing the offense for which he is on trial." *Tutiven*, 40 F.3d at 5 (emphasis added). By contrast, the evidence admitted below bore special relevance to a pivotal element of the alleged offense quite apart from appellant's propensity to commit wrongful acts; *viz.*, the "reasonableness" of Gedara's stated fear that she would be a target of appellant's physical violence should she disobey him. *See United States v. Oreto*, 37 F.3d 739, 749 (1st Cir.1994) (evidence of victim's awareness of defendant's prior bad acts against third parties is especially relevant to an element of the offense, i.e., the reasonableness of the stated basis for the victim's fear) (citing *United States v. DeVincent*, 546 F.2d 452, 456–57 (1st Cir.1976), *cert. denied*, 431 U.S. 903, 97 S.Ct. 1694, 52 L.Ed.2d 387 (1977)), *cert. denied*, —— U.S. ——, 115 S.Ct. 1161, 130 L.Ed.2d 1116 (1995).

### 3. *Evidence of Ethnic Background and National Origin*

 Appellant now claims that the government deliberately introduced evidence of repressive Kuwaiti customs and practices toward domestic workers primarily to inflame any ethnic bias among the jurors.[14] Since he asserted no contemporaneous objection, we review for plain error. *See United States v. Figueroa*, 976 F.2d 1446, 1455 (1st Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 1346, 122 L.Ed.2d 728 (1993) (finding claim of ethnic bias waived, and no plain error). We will reverse "only if the error 'seriously affect[ed]

the fundamental fairness and basic integrity of the proceedings.' " *Tuesta–Toro*, 29 F.3d at 775 (citing *United States v. Carty*, 993 F.2d 1005, 1012 n. 9 (1st Cir.1993)). We find no error.

. The government itself cautioned the jury during closing argument that appellant's mere *status* as a foreign national should play no part in their deliberations. Further, at no point during the trial did the government make any inflammatory remark relating to the Alzankis' ethnic background or national origin. *See United States v. Ovalle–Marquez*, 36 F.3d 212, 221–22 (1st Cir.1994) (finding remarks not inflammatory because, *inter alia*, they "serve [a] purpose other than to inflame"), *cert. denied*, —— U.S. ——, 115 S.Ct. 1322, 131 L.Ed.2d 202 (1995). Finally, unlike cases in which evidence of this type has been found marginally relevant at best, *see, e.g., United States v. Rodriguez Cortes*, 949 F.2d 532, 541–42 (1st Cir.1991) (finding that admission of defendant's Colombian identification card impermissibly invited jury to conclude that "a person ... born in Colombia ... must be involved in drug trafficking"); *see also United States v. Doe*, 903 F.2d 16, 18 (D.C.Cir.1990) (noting that prosecutor frequently referred to defendants as "Jamaicans" and stressed expert testimony to the effect that "Jamaicans" were known to be deeply involved in drug trafficking), prevailing Kuwaiti customs were highly probative on at least three issues material to the section 1584 prosecution. *See, e.g., Figueroa*, 976 F.2d at 1455 (no plain error where evidence related to true source of large bank deposits in defendant's name, corroborated certain admissions by defendant, and bolstered credibility of important government witness whose credibility was challenged by defense).

First, it could be inferred that Gedara—as a former domestic servant in Kuwait—developed a "special vulnerability" to the Alzankis' threats, even though an American domestic worker might not have been placed "reasonably" in fear thereby. *See Kozminski*, 487

---

**14.** During jury impanelment, the trial judge scrupulously inquired of each prospective juror whether the ethnic background or national origin of the defendants would affect the juror's capacity to serve impartially. Certain prospective jurors were excused for cause on these grounds.

U.S. at 952, 108 S.Ct. at 2765. For example, the evidence relating to Kuwaiti customs and practices clearly tended to buttress the reasonableness of Gedara's stated belief in appellant's warnings that the American police, like their Kuwaiti counterparts, were under orders to shoot undocumented domestic workers who ventured out alone. Gedara likewise would have been especially vulnerable to the coercive force of appellant's frequent threats to punish her disobedience by *returning her to Kuwait,* rather than to her native home in Sri Lanka. Moreover, appellant's own familiarity with Kuwaiti customs could generate the reasonable inference that appellant played on Gedara's isolation and vulnerabilities, making it more probable that he acted with the requisite *specific intent* to subject her to involuntary servitude. Indeed, appellant sought to capitalize on the very same evidence by arguing to the jury that he should not be convicted since his experiences growing up in Kuwait had never put him on fair notice that his treatment of Gedara might be considered criminal in other cultures.

### 4. *Hearsay Testimony*

■ Appellant next challenges, as inadmissible hearsay, the testimony given by several nurses and a respiratory specialist who came to the Alzankis' apartment to care for their ailing child, and by a police officer who interviewed Gedara immediately after she fled the apartment. These witnesses related various contemporaneous statements Gedara made to them concerning the harsh conditions and inhumane treatment she experienced at the hands of the Alzankis. The government offered their testimony under Rule 801(d)(1)(B) (prior consistent statements offered to rebut charge of recent fabrication). The district court admitted their testimony under Rule 803(3) (statements of declarant's then-existing state of mind). We review for abuse of discretion. *United States v. Paulino,* 13 F.3d 20, 24 (1st Cir. 1994).

■ Some of the challenged testimony clearly was admissible under Rule 803(3), such as Gedara's contemporaneous statements as to her state of mind—that she was afraid, hungry, exhausted. On the other hand, Rule 803(3) has been held not to allow more expansive statements elaborating upon the underlying reasons for the declarant's state of mind. *See, e.g., United States v. Fontenot,* 14 F.3d 1364, 1371 (9th Cir.), cert. denied, —— U.S. ——, 115 S.Ct. 431, 130 L.Ed.2d 343 (1994); *United States v. Cohen,* 631 F.2d 1223, 1225 (5th Cir.1980). In any event, we may affirm the district court ruling on any ground apparent from the appellate record. *United States v. Norton,* 26 F.3d 240, 244 (1st Cir.1994).

■ The government was entitled to introduce the challenged testimony to establish the truth of the matter asserted, if (1) the declarant (*viz.,* Gedara) testified at trial and was subject to cross-examination; (2) the challenged statements and her trial testimony were consistent; and (3) the challenged statements were offered to rebut an express or implied charge that the declarant recently fabricated her story, or became subject to some improper influence or motive to falsify after making the challenged statement. *See Tome v. United States,* —— U.S. ——, 115 S.Ct. 696, 130 L.Ed.2d 574 (1995); *United States v. Arias–Santana,* 964 F.2d 1262, 1264 (1st Cir.1992); *United States v. Piva,* 870 F.2d 753, 758 (1st Cir.1989). All three criteria for admission under Rule 801(d)(1)(B) were met.

■ At trial, Gedara testified consistently with her previous statements to the nurses, therapist, and police officer. By suggesting, on cross-examination, that Gedara recently had met with a Hollywood producer interested in purchasing the film rights to her "story," that she was engaged in a Hollywood bidding war, and that she had been interviewed by Boston newspapers to drum up publicity for her "story," defense counsel plainly impugned Gedara's motives and just as clearly invited the government to respond—as it did—with corroborative evidence that Gedara had made statements consistent with her trial testimony long before the motivations attributed to her by the defense had ever arisen. *See United States v. Montague,* 958 F.2d 1094, 1095 (D.C.Cir. 1992).

### E. *The Restitutionary Sentence*

Finally, appellant contends that the restitutionary sentence imposed pursuant to the Victim and Witness Protection Act, 18 U.S.C. § 3663(b)(2)(A), constituted error because it reimbursed Gedara for (1) lost overtime wages to which she was not entitled under the applicable law, *see* Fair Labor Standards Act, 29 U.S.C. § 213; Massachusetts Wage and Hour Act, Mass.Gen.L.Ann. ch. 151; (2) lost wages for time she took off from her job to assist the government in prosecuting its case against the Alzankis, *but see Ratliff v. United States*, 999 F.2d 1023, 1026 (6th Cir. 1993); and (3) psychological counseling for chronic stress symptoms attributable to her abusive treatment, *but cf.* 18 U.S.C. § 3663(b)(2)(A) (restitution only for "*bodily injury*").

 We decline to address appellant's challenges to the restitutionary sentence since these claims were never raised below. *See United States v. Dietz*, 950 F.2d 50, 55 (1st Cir.1991).[15] Appellant's utter failure to object disabled the sentencing court from making a reasoned assessment of the present claims in the first instance, and from making the predicate factual findings upon which the claims depend. For example, as concerns appellant's second claim, the government responds that the restitutionary sentence did *not* include reimbursement to offset leave time Gedara took to help the government prepare its case, but merely to reimburse her for lost wages occasioned by having to leave her new employment to obtain treatment for the debilitating stress she experienced during her four-month ordeal. The government concedes that reimbursement for Gedara's assistance in preparing for trial would be problematic as a matter of law, but appellant's failure to alert the district court to the claim, raised for the first time on appeal, prevented the sentencing court from clarifying the *factual* basis for its restitutionary sentence. Lastly, appellant's only attempt at addressing the government's waiver argument—that he promptly appealed the restitutionary sentence—is no answer at all. Nor did he request reconsideration of the restitutionary sentence. *See* Fed.R.Crim.P. 35(c); *cf. United States v. Heilprin*, 910 F.2d 471, 474 n. 5 (7th Cir.1990).

### III

### *CONCLUSION*

The district court judgment must be affirmed.

***Affirmed.***

---

**15.** Indeed, as concerns the first contention, appellant flatly stated at sentencing that he *"would leave it up to the Court to determine what is an appropriate restitution figure."* Nor did he cite to the two statutes upon which he now relies. Rather, he left the district court with the clear impression that *some* overtime wages might be appropriate as a matter of law.