United States Court of Appeals
 For the First Circuit
 

Nos. 96-1916

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 FRED AWON,

 Defendant, Appellant.
 

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MASSACHUSETTS

 [Hon. George A. O'Toole, Jr., U.S. District Judge] 

 

 Before

 Stahl, Circuit Judge, 
 Coffin and Aldrich, Senior Circuit Judges. 

 

 Robert A. George for appellant. 
 James F. Lang, Assistant United States Attorney, with whom 
Donald K. Stern, United States Attorney, was on brief for 
appellee.

 

 February 2, 1998
 

 COFFIN, Senior Circuit Judge. Defendant Fred Awon appeals 

his conviction for arson, use of a fire to commit a felony, and

mail fraud. He asserts that the district court erred in: (1)

admitting prior consistent statements of two government

witnesses; (2) limiting cross-examination of a witness; (3)

refusing to grant a mistrial after improper cross-examination of

defendant; and (4) imposing too high a base offense level at

sentencing. Most of this opinion deals with the first issue. We

fault the government for pressing admission and the court for

admitting the evidence, but conclude that the error could not

have affected the verdict. We affirm.

 I. BACKGROUND

 Defendant was convicted by a jury for twice orchestrating

the arson of a building located on Ames Street in Brockton,

Massachusetts ("the Ames building") by hiring James St. Louis,

and two brothers, Jorge and Joaquim Neves, to set the fires.1

The Ames building, owned by defendant and his father, contained

vacant retail space on the first floor and two occupied

residential apartments on the second floor at the time of both

fires. The first fire caused minimal damage; the second required

the demolition of the building and two adjacent buildings.
  

 1 St. Louis and defendant were tried together, but St.
Louis, indicted for setting both fires, was convicted for setting
the second fire only. Jorge Neves, who was involved in the first
fire, was never charged, but Joaquim was indicted on four
separate counts and, before trial, entered into a plea agreement
with the government whereby he pled guilty to arson and mail
fraud counts stemming from his role in the second fire.

 -2-

 We review the evidence presented at trial by defendant and

the government. Because defendant does not challenge the

sufficiency of the evidence, we describe the relevant evidence

without favor to either party to provide context for the claimed

errors. See United States v. Morla-Trinidad, 100 F.3d 1, 2 (1st 

Cir. 1996).

A. The Neves Brothers 

 Jorge testified that, in mid-1994, St. Louis recruited him

to help set fire to the building, stating that they would receive

money and a car as payment from defendant, who owned a used car

dealership. Jorge admitted to pouring and lighting gasoline on

the first floor of the building, at the direction of St. Louis.

Firefighters arrived shortly thereafter, preventing damage to the

building; as a result, Jorge never received payment from

defendant.

 Jorge's testimony also revealed that the government agreed

not to prosecute him in exchange for his cooperation in court,

that for the past six months he had been held in custody as a

material witness and wanted to be released, and that he had

several criminal cases pending against him at the time of trial. 

 Joaquim testified that, in the summer of 1994, he learned

from St. Louis' brother that defendant was looking for someone

who would burn down the Ames building. Joaquim reported that he

agreed to set the fire in exchange for $5,000, and then solicited

St. Louis' assistance; but, an illegal immigrant, he was detained

by the United States Immigration and Naturalization Service (INS)

 -3-

before he could act. After his release on bail, he and St. Louis

told defendant they would set the fire. Joaquim testified that

he witnessed defendant agree to pay St. Louis with a car valued

at $2,900. Joaquim admitted pouring gas on the first and second

floors of the Ames building, which was then lit by St. Louis,

resulting in an explosion and fire that destroyed the building. 

 Joaquim also testified that, the day after the fire, he and

St. Louis went to defendant's shop, where St. Louis signed

paperwork for the car. The following day, Joaquim went with St.

Louis to get the car from defendant, and a few days later, he

personally received $2,100 in cash from defendant.

 Joaquim reported that, in exchange for his testimony and a

guilty plea, the government would request that the court depart

downward from his guidelines sentence. He also acknowledged that

he feared impending deportation, and that he had an extensive

criminal history.

 Defendant denied soliciting either of the Neves brothers to

commit arson. He explained that Joaquim had become angry with

him sometime prior to the fire because defendant had refused to

provide him with bail from INS custody, and had twice ordered

Joaquim off his car lot. On the first occasion, about two weeks

before the second fire, Joaquim told defendant that he wanted to

buy an expensive car, and became angry when defendant questioned

him about where he would get the money; the second time, when

defendant asked Joaquim whether he had been involved in the fire,

Joaquim responded in the negative, but smirked suspiciously. On

 -4-

cross-examination, defendant stated that he did not tell the

police when they interviewed him before trial about any existing

hostility between himself and Joaquim.

 St. Louis' brother denied having any conversation with

defendant or Joaquim about burning defendant's property. 

B. The Car Transfer  

 In addition to Joaquim's testimony that defendant paid St.

Louis with a car, the government introduced into evidence

business records belonging to the defendant's auto company.

These indicate that defendant sold a car to St. Louis for $2,000

one day after the second fire. They also indicate that, a few

months earlier, the company had purchased that same car for

$2,220. 

 Defendant testified that the sale to St. Louis was a

legitimate one, for which he received $2,000 in cash. He

explained that he sold at a loss because the car had mechanical

problems and had failed to sell for a few months at the intended

price of $3,500. Defendant said that he questioned St. Louis

about the source of the $2,000, and that St. Louis refused to

answer him.2 

 Joaquim's mother testified that, when her son was in INS

custody, she gave St. Louis $1,000 toward the $3,000 needed for

his bail and, the following day, Joaquim was released. The

defense argued that this evidence showed, inferentially, that St.

Louis had supplied the remaining $2,000, which, as soon as
  

 2 St. Louis did not testify at trial.

 -5-

Joaquim repaid it, St. Louis used to buy the car from defendant.

On cross-examination by the government, Joaquim's mother stated

that she did not know whether St. Louis put up any money for

Joaquim's release on bail from INS custody. 

C. Motive 

 The government introduced evidence showing that the Awons

were losing money on the Ames buildings and, at the time of both

fires, the property was insured for loss to the structure of up

to $80,000, and losses attributable to business interruption of

up to $12,000. After the first fire, defendant and his father

negotiated an insurance settlement in the amount of $4,171.

After the second fire, they negotiated a settlement totalling

$91,176, and then used this money to pay their mortgage on the

property.

 Defendant's parents testified that all of the money invested

in the Ames building belonged to them, that their son had no

responsibility for financial expenditures related to the

building, and that he had never received rental income from the

apartments. They explained that their son's name was included on

the deed and mortgage only because they did not speak English

fluently and needed their son's assistance to translate the

documents. They described their son's involvement with the

property as limited to showing the apartments to prospective

tenants and responding on occasion to maintenance requests. They

also stated that they, not their son, received the settlement

money after the fires.

 -6-

 Defendant testified that, while a co-owner of the Ames

building, he did not put up any of the purchase money, make any

mortgage payments, or pay taxes on the property. On cross-

examination, however, the government introduced evidence that

defendant had made at least one mortgage payment on the property.

Defendant then stated that he could not remember having made any

other mortgage payments. He also admitted that his name was

listed on the settlement check from the insurance company, but

maintained that his father received all the proceeds.

 II. ADMISSION OF THE NEVES' OUT-OF-COURT STATEMENTS

 The first and only difficult issue we consider in this case

is the admission at trial of out-of-court statements made by the

Neves brothers. Each brother made a written and oral statement

to police months before trial, implicating himself, St. Louis and

defendant in the respective arsons. These statements, which were

otherwise inadmissible as hearsay, were admitted at trial under

an exception for prior consistent statements. We generally

review admission of hearsay evidence for abuse of discretion.

United States v. Paulino, 13 F.3d 20, 25 (1st Cir. 1994). But 

where, as here, the issue concerns a factual determination, such

as when the statement was made relative to a suggested motive to

fabricate, we review for clear error. See United States v. Vest, 

842 F.2d 1319, 1329 (1st Cir. 1988). We may affirm the district

court's admission of hearsay testimony on any ground apparent

 -7-

from the appellate record. United States v. Alzanki, 54 F.3d 

994, 1008 (1st Cir. 1995). 

A. Rule 801(d)(1)(B) 

 The district court allowed use of the Neves' out-of-court

statements under Fed. R. Evid. 801(d)(1)(B). Under that rule,

prior consistent statements that would otherwise be inadmissible

hearsay evidence may be admitted into evidence when: (1) the

declarant testifies at trial and is subject to cross-examination;

(2) the challenged statements and trial testimony are consistent;

and (3) the challenged statements are offered to rebut a charge

that the declarant recently fabricated his story, or that the

declarant became subject to some improper influence or motive to

falsify after making the statements. See Tome v. United States, 

513 U.S. 150, 158 (1995) (holding that consistent out-of-court

statements may be admitted to rebut a charge of recent

fabrication or improper influence or motive only when those

statements pre-date the charged fabrication, influence, or

motive3). 

 The issue of the Neves' pre-trial cooperation was raised

initially on cross-examination. In response to defense

  

 3 In Tome, the prosecution introduced a child's out-of- 
court statements concerning sexual abuse by her father, who had
primary custody, made while the child was on vacation with her
mother. The defense argued at trial that the child's testimony
was motivated by her desire to live with her mother. The trial
court admitted the statements, but the Supreme Court reversed,
reasoning that their admission was improper because the child
possessed the same motive -- to live with her mother -- at the
time she made the out-of-court statements as when she testified
in court. 513 U.S. at 150-55, 166.

 -8-

questions, Jorge testified that he first made statements

implicating himself, defendant, and St. Louis in the fire only

after the police said they knew he was involved and promised not

to charge him if he cooperated. Similarly, Joaquim explained on

cross-examination that he made out-of-court statements to

investigators only after they said they knew he had set the fire,

had a lengthy criminal record, and was being sought for

deportation, and then promised that they would bring any

cooperation to the prosecutor's attention.

 On redirect of each brother, the court allowed the

government to introduce their out-of-court oral and written

statements under Rule 801(d)(1)(B). The oral statements were

introduced through the testimony of a government agent; the

written statements were admitted as evidence. The government

argued, and the court agreed, that these statements were

admissible to rebut the motive to fabricate presented by the

defense, namely, incentive by the brothers to reduce their

punishment for arson. The defense objected, arguing that the

alleged motive to fabricate pre-dated these statements, rendering

Rule 801(d)(1)(B) unavailable. Defendant renews this objection

on appeal.

 Our review persuades us that the defendant is correct. The

motive to fabricate alleged by the defense -- desire for leniency

-- was the same when the Neves brothers first spoke with police

as at the time of their testimony at trial. The government

attempts to justify use of the out-of-court statements by

 -9-

pointing out that the defense ascribed additional motives and

influences to the Neves that did not exist when the out-of-court

statements were made. These were, as to Jorge, that (1) he

testified to obtain release from a six-week long incarceration as

a material witness; (2) he hoped to receive in exchange for his

testimony some dispensation in a different -- and new -- matter

pending against him; (3) his testimony was influenced by pre-

trial preparation with the agent who interviewed him. As to

Joaquim, these were (1) anticipation of a lesser sentence under a

plea agreement that promised a government request for a downward

departure of his sentence following his testimony at trial, and

(2) trial preparatory sessions with the government. While it is

true that these allegations post-dated the out-of-court oral and

written statements, the overarching motive alleged by the defense

always was hope of leniency, and therefore, the "new" motives

amount to no more than smaller subsets of the larger theme. For

instance, the assertion that the prosecution directed the Neves'

testimony assumes that the brothers had a reason to do as the

government requested, namely, hope of a reduced sentence or

charge. Likewise, Jorge's desire to obtain release from custody

as a material witness was just a specific incarnation of his more

general desire not to be jailed for his role in the first fire.

See United States v. Albers, 93 F.3d 1469, 1482-84 (10th Cir. 

1996) (even where the circumstances underlying a motive to

fabricate have changed somewhat -- a formal plea agreement was

entered after the statement was made, but before testimony at

 -10-

trial -- prior consistent statements remain inadmissible if the

motive remains essentially the same). 

 Because all the defense allegations of motive to fabricate

grew from the same foundation -- a pursuit of leniency -- the

brothers' out-of-court statements were erroneously admitted under

Rule 801(d)(1)(B).

B. The Doctrine of Completeness 

 The inadmissibility of these statements under Rule

801(d)(1)(B) does not end our discussion, as we must explore

whether the statements could be properly admitted on some other

ground apparent from the appellate record. Alzanki, 54 F.3d at 

1008. The government argues that Joaquim's prior statements4 are

admissible under the doctrine of completeness. This doctrine,

codified in Fed. R. Evid. 106, holds that an otherwise

inadmissible recorded statement may be introduced into evidence

where one side has made a partial disclosure of the information,

and full disclosure would avoid unfairness to the other party.

See Irons v. FBI, 880 F.2d 1446, 1453 (1st Cir. 1989); United 

States v. Range, 94 F.3d 614, 620 (11th Cir. 1996).  

 While defense counsel cross-examined Joaquim concerning the

substance of his written interview statement, and did highlight

some inconsistencies between that statement and Joaquim's trial

  

 4 The government makes no such claim as to Jorge's
statements, but our analysis considers the doctrine as to both
defendants, as we may affirm on any legal ground.

 -11-

testimony,5 there is no evidence that -- and the government has

made no allegation that -- the introduction of these pieces of

information created any unfairness or potential for

misimpression. To the contrary, the government's primary

argument is that the written statements bolster the Neves' in-

court testimony. The doctrine of completeness does not permit

the admission of otherwise inadmissible evidence simply because

one party has referred to a portion of such evidence, or because

a few inconsistencies between out-of-court and in-court

statements are revealed through cross-examination; rather, it

operates to ensure fairness where a misunderstanding or

distortion created by the other party can only be averted by the

introduction of the full text of the out-of-court statement. See 

United States v. Ellis, 121 F.3d 908, 921 (4th Cir. 1997). Here, 

the inconsistencies revealed were minute insofar as defendant's

basic involvement is concerned, and the Neves clearly identified

defendant at trial as the mastermind of the Ames building arsons.

The doctrine of completeness therefore does not provide a basis

for introduction of the earlier statements.

C. Harmless Error 

 The government argues that, even if the introduction of the

statements constitutes error, the error was harmless. The

erroneous admission of hearsay requires reversal unless the error
  

 5 Among other minor inconsistencies, the defense brought
out Joaquim's earlier claims that he was solicited to set the
fire by defendant directly rather than by St. Louis' brother,
that he received $2,500 rather than $2,100 in payment, and that,
though both were together, he and not St. Louis lit the gasoline.

 -12-

is shown to be harmless beyond a reasonable doubt. See United 

States v. Lombard, 72 F.3d 170, 187 (1st Cir. 1995). 

 By definition, prior consistent statements do not consist of

new substantive information. Their impact comes from

corroborating other, perhaps less compelling, evidence. The form

in which the material is presented to the jury also may affect

its weight if legitimacy, possibly otherwise weak, is thereby

attached to the statements. See United States v. Siegel, 717 

F.2d 9, 19 (2d Cir. 1983). The question we must answer is

whether corroboration resulting from the introduction of the

prior consistent statements influenced the jury to the

defendant's detriment. See United States v. Quinto, 582 F.2d 

224, 236 (2d Cir. 1978) (finding such influence where the

erroneously admitted out-of-court written statement was an

official Internal Revenue Service document, and a lengthy,

detailed "condensation of the government's whole case against

defendant").

 As with the typical admission of prior consistent

statements, the introduction of the out-of-court statements did

not themselves supply any new information to the jury. Rather,

the testimony adduced at trial was complete and convincing in

tying defendant to the crime. Not only did the Neves implicate

themselves, St. Louis and defendant at trial, but on cross-

examination, they revealed having reported defendant's

solicitation of them to authorities months before trial. 

 -13-

 Nonetheless, both the oral and written statements

unquestionably had some effect. The government agent's testimony

about the oral confessions lent a measure of credibility to the

Neves' stories, if only because a government agent was shown to

have believed them. Similarly, the written statements, because

they were reduced to print and reviewable during deliberations,

added weight to the in-court testimony. See id. (describing the 

introduction of written consistent statements as "[t]he

government witnesses in effect accompan[ying] the jury into the

jury room.") But, unlike the statements in Quinto, the written 

confessions were not detailed, official documents from an agency

denoting authority. Rather, they were fairly compact -- one just

over one page, the other, just over two pages -- handwritten

statements made by the witnesses themselves, replete with

grammatical and spelling errors. While revealing slight

inconsistencies, the out-of-court statements essentially amounted

to an abbreviation of the Neves' in-court testimony implicating

defendant.6 This in-court testimony, supported by the

circumstantial evidence of motive and car transfer, was

unwavering and unambiguous. 

  

 6 On direct, the prosecution failed to elicit testimony
from Jorge implicating defendant, but on cross-examination, the
defense several times led Jorge to affirm defendant's
involvement, which testimony was confirmed on redirect. Because
Jorge's testimony on direct alone did not clearly implicate
defendant and did not reveal the prior statements to authorities,
our analysis would be different if we had only this testimony to
consider.

 -14-

 The exculpatory evidence presented by defendant was minimal

and largely unsupported. For example, it seems unlikely that

defendant would sell a car at a loss, and $1,500 less than asking

price, without first attempting to sell it at a price slightly

reduced from $3,500. In addition, the timing of the sale,

shortly after the second fire, was highly suspect, and defendant

had an undeniable economic motive to burn the property, even if

the jury believed his claim that his parents received the

insurance proceeds. Nor does defendant's explanation of how St.

Louis came into $2,000 seem plausible; first, it assumes that St.

Louis had $2,000 to lend Joaquim for bail and second, Joaquim's

mother testified that she had no knowledge that St. Louis had

contributed toward Joaquim's bail. Similarly, while defendant

and his parents claimed that he had no financial interest in the

Ames building, the circumstantial evidence presented indicated

otherwise; for instance, his name was listed on all Ames building

legal documents, including the settlement check, and, despite his

initial testimony to the contrary, he made at least one mortgage

payment on the property. Finally, defendant's claim that Joaquim

would have sufficient animosity toward him to set the fire or

testify against him seems unlikely, and is unsupported by

evidence other than defendant's own testimony. As the evidence

against defendant was plentiful and in no way illuminated by the

out-of-court statements, we are persuaded beyond a reasonable

doubt that the statements did not influence the jury to

defendant's detriment. We emphasize that it is the strength of

 -15-

the evidence properly introduced at trial implicating defendant

that renders this serious error harmless.

 That the statements constituted unnecessary emphasis makes

the government's efforts to introduce them particularly difficult

for us to understand. Where the law so clearly bars such

statements and the evidence is so weighty against the defendant,

the government's arguments for their introduction strike us as a

serious and careless abuse of the rules of evidence. This fact

notwithstanding, the evidence compels us to find that the error

was a legally harmless one. 

 III. ALLEGED ERRORS DURING CROSS-EXAMINATION AND SENTENCING

 Defendant argues that the district court erred in limiting

his cross-examination of Joaquim, that the prosecutor improperly

implied, without basis, that he had funded his codefendant's

defense, and finally, that the court erred in calculating the

defendant's base offense level for two arson counts. We examine

each allegation in turn.

 Defendant contends that the trial court violated his Sixth

Amendment right to confront adverse witnesses when it refused to

allow him to question Joaquim about his history of drug dealing.

A trial court's restriction of cross-examination may be reversed

only for abuse of discretion. United States v. Ovalle-Marquez, 

36 F.3d 212, 217 (1st Cir. 1994). To show abuse, the defendant

must demonstrate that the restriction left the jury without

sufficient information to make a discriminating assessment of the

 -16-

witness' bias or motives. United States v. Twomey, 806 F.2d 

1136, 1140 (1st Cir. 1986). 

 Defendant maintains that the testimony should have been

admitted because it supports the defense theory that Joaquim set

fire to the Ames building on his own initiative to dissuade

defendant, a past informant for the Drug Enforcement

Administration ("DEA"), from reporting his drug dealing, or,

alternatively, as revenge because he believed defendant had

already reported him. During a sidebar discussion, the court

asked for some offer of proof from defendant that Joaquim had

reason to believe that defendant would report him. Defendant

offered evidence that, before the second fire, Joaquim told

defendant that he would soon be getting a great deal of money and

that Joaquim became hostile when defendant questioned him about

its source. Joaquim, however stated on voir dire that he had

been unaware that defendant was a DEA informant, and defendant

offered no evidence in rebuttal. Concluding that defendant's

offered evidence was too tenuous, the court prohibited the cross-

examination about drug dealing.

 In light of the sparse evidence presented by defendant

linking Joaquim's drug-dealing to a motive to burn down the Ames

building, no showing that Joaquim knew that defendant had

reported drug dealers to the DEA, and extensive opportunity for

the defense to question Joaquim as to bias and motive on a

variety of other issues for which there was an evidentiary basis,

we find that the court did not abuse its discretion in excluding

 -17-

this line of questions. Defendant also challenges the

court's failure to grant a mistrial after the government asked

him whether he had agreed to pay St. Louis' defense costs. St.

Louis' attorney objected to this questioning and requested a

mistrial on the ground that the information on which it was based

was unreliable and misleading. The court sustained the objection

but denied the mistrial, opting instead for a curative

instruction which directed the jury to disregard the question

because the government offered no evidentiary basis for it.

Although joining in the request for a curative instruction,

defendant's attorney did not join in the request for a mistrial,

and at no time did he object to any portion of the instruction or

allege its insufficiency. 

 Because the defense failed to raise this issue below, we

review it only for plain error. United States v. Crochiere, 129 

F.3d 233, 237 (1st Cir. 1997). Even assuming the questioning was

improper, we conclude that the court properly refused to grant a

mistrial, and that it presented the jury with a comprehensive

curative instruction, wholly satisfactory under the

circumstances. "Declaring a mistrial is a last resort, only to

be implemented if the taint [from improper information] is

ineradicable, that is, only if the trial judge believes that the

jury's exposure to the evidence is likely to prove beyond

realistic hope of repair." United States v. Sepulveda, 15 F.3d 

1161, 1184 (1st Cir. 1993). In this case, the questioning was

brief, and the judge was careful to explain to the jury that (1)

 -18-

the question was improper; (2) there was no offered evidentiary

basis for the facts suggested by the question; and (3) the

question should be disregarded "entirely." As we presume that

juries follow the court's instructions, and defendant has not

shown that the questioning resulted in serious prejudice as

required to overcome the presumption, United States v. Rullan- 

Rivera, 60 F.3d 16, 18 (1st Cir. 1995), we conclude that the 

court did not commit plain error. 

 Finally, defendant contends that the court erred in using a

base offense level of twenty-four rather than twenty on the arson

counts. The higher level applies if the defendant can be found

to have knowingly created a substantial risk of death or serious

bodily injury; the lower level applies where the "knowing"

element is not met. U.S.S.G. 2K1.4(a)(1), (2). Defendant was

convicted for two separate acts of arson, based on evidence that

he hired others to burn down a residential and commercial

property to collect insurance proceeds. It does not follow that,

as defendant contends, because the fires were carried forth in an

"amateurish" fashion, his effort to burn a building in which

people lived was anything other than a knowing creation of a

substantial risk of death or serious bodily injury. We therefore

reject the argument as without merit.

 For the reasons stated above, we affirm the judgment of the affirm 

district court.

 -19-