313 Ga. 276
FINAL COPY

S21G0150.  MARTINEZ-ARIAS v. THE STATE.

WARREN, Justice.

Alejandro Martinez-Arias was tried by a Hall County jury and convicted of aggravated child molestation, aggravated sexual battery, and child molestation.  In his appeal to the Court of Appeals, Martinez-Arias contended, among other things, that the trial court erred when it allowed the State to present opinion testimony about certain purported aspects of Mexican or Latino culture from a school counselor who had worked with M. J., the child victim.  The Court of Appeals affirmed, concluding that the trial court did not abuse its discretion in admitting the disputed testimony.  See *Martinez-Arias v. State*, 356 Ga. App. 423 (846 SE2d 448) (2020).  We granted certiorari and asked the following question: "Did the trial court commit reversible error when it admitted opinion testimony about cultural characteristics of an ethnic group?"  For the reasons that follow, we conclude that the trial court abused its

discretion when it admitted this testimony, but we nonetheless affirm because the error was harmless based on the record in this case.

1.  *Background.*

(a)  The evidence presented at trial showed that Martinez-Arias—who was the boyfriend of M. J.'s aunt, Maria Cruz—sexually abused M. J. over the span of approximately three years. M. J. testified that, when she was nine years old, she began living in Illinois with Cruz, Martinez-Arias, and M. J.'s two brothers. Previously, M. J. had lived for a year in Mexico with her father, and before that, she had lived with her grandfather in Illinois. About six months after she began living with Cruz, M. J. moved to Georgia with Cruz, Martinez-Arias, and her two brothers.

At first, the five lived in a small house in Gainesville. There, M. J. shared a room with her brothers, with a makeshift barrier providing some privacy. M. J. testified that she was in fifth grade at the time, and when she came home from school, Martinez-Arias

would come into her room and touch her "private area," including her chest.  According to M. J., this happened multiple times per day.

After several months, M. J.'s family (including Martinez-Arias) moved into a bigger house, where they remained for about two years.  There, M. J. had her own room, but it adjoined the bedroom Cruz shared with Martinez-Arias, and only a curtain separated the two rooms.  Moreover, because of the house's layout, M. J. had to walk through Cruz's bedroom to get to the rest of the house.  M. J.'s brothers shared a room in another part of the house, and M. J. testified that Cruz and Martinez-Arias would not let her spend time with her brothers in that room.

M. J. testified that, during the time she lived in the second house, Martinez-Arias would come into her room at night and do things she "didn't like."  Specifically, Martinez-Arias would take off her clothes, including her underwear, and touch her "private areas" with his hands and mouth, and he would touch her not "just on the outside of [her] private parts."  Sometimes when he did that, Martinez-Arias would be wearing just a towel.  He did this to her

3

"[a]lmost" every day, a "couple times a day," throughout the two years that M. J. lived there.

M. J. testified that she did not tell anyone about the abuse at the time because her aunt was "happy" with Martinez-Arias, and M. J. "didn't want him to leave [her] aunt." Moreover, M. J. "didn't know if anyone would believe [her]," and she was "scared" that if she disclosed the abuse to her brothers, she "would lose them too." To cope with the abuse over the years, M. J. would cut herself on her arms and legs with a razor.

In late January 2015, M. J. finally disclosed the abuse to her older brother, A. J., who was 14 years old at the time. In response, A. J. gave M. J. a cell phone to use in an attempt to record an encounter with Martinez-Arias, and she did so that night.[1] A short

---

[1] At trial, A. J. testified for the State, and when asked how he found out about M. J.'s abuse, he responded: "My little sister came to me with cuts all over her body, basically, to her thighs and arms, they were cut. And she said she couldn't take it anymore." A. J. testified that he initially "got mad" at M. J. because of the cuts, but then she told him that Martinez-Arias "had been touching her for the past two years." A. J. testified that he had first noticed cuts on M. J.'s body four or five months after they moved to Georgia, and the cutting "ended up getting worse and worse day by day." When A. J. asked M.

4

audio clip from the cell phone was played for the jury at trial; it appears undisputed that the clip contains the voices of Martinez-Arias and M. J., with Martinez-Arias saying something indistinguishable and M. J. saying "stop." M. J. testified that the recording revealed her telling Martinez-Arias to "stop" touching her.[2]

The same night that she made the recording, M. J. and her brothers packed up some of their belongings, contacted their grandmother, Brenda Pizano—who lived in Illinois—and left their house on foot. Pizano started a 12-hour drive to Georgia and eventually found the children "out on the street hiding," picked them up, and contacted law enforcement. The children were placed in foster care for about a week and then released into the custody of Pizano, who took them back to Illinois.

---

J. to record an abusive encounter on his cell phone, he said she was "very hesitant," but, A. J. testified, "the evidence was needed."

[2] A cell phone forensic investigator later testified that the recording was made at 10:27 p.m. on January 29, 2015.

Pizano testified that when she picked up the children on the night they left their house, M. J. told her that Martinez-Arias "was trying to molest her, he was feeling all over her and touching her bottom parts." When Pizano asked M. J. whether that "really had happened," M. J. "thought [Pizano] wasn't believing her and she was upset at first and she said she's not lying, that it happened."

According to Pizano, when M. J. and her brothers moved back to Illinois, M. J. "was happy to be back" at first, "but she also had a lot of anger issues, a lot of sadness," and she "shut[ ] herself up in her bedroom a lot." Asked about her discussions with M. J., Pizano testified:

> I have asked [M. J.] to tell me everything that had happened, what he did, where he touched her, and she would get upset all the time and run[ ]away. And one time she got really upset and she says, Are you satisfied now? This is what you wanted me to show, my emotions? He touched me down there. He licked me, he fingered me. Is that what you wanted me to tell you guys? I have a hard time talking about this. She said, I don't want nobody to know what happened to me.

Pizano also testified that M. J. suffered from nightmares and had trouble sleeping and that she had "tried to commit suicide, she

6

has done razor cuts on herself." The suicide attempt, Pizano testified, occurred when M. J. found out she might have to come to Georgia to testify at Martinez-Arias's trial.

(b) After disclosing the abuse to law enforcement officials, M. J. underwent a forensic interview and a forensic physical examination. The nurse practitioner who examined M. J. testified that, when she asked M. J. if she knew the purpose of the examination, M. J. replied, "To get checked because [Martinez-Arias] has been putting his fingers and mouth inside me for a long time." The physical examination did not show conclusively whether M. J. was sexually abused, but it did reveal "linear" abrasions "on certain places on [M. J.'s] body . . . on her left wrist as well as her right hip, outer thigh area, that were indicative of former or previous lacerations that had healed and scarred." A video recording of the forensic interview was introduced into evidence and played for the jury at trial.

(c) In addition to evidence specifically concerning M. J., the State presented the testimony of Dr. Julie Battle—a licensed

psychologist and the chair of the psychology department at Brenau University who also had experience at a Hall County child advocacy center conducting forensic interviews of children who alleged to have suffered abuse. After Dr. Battle detailed her educational and professional qualifications, and without objection from the defense, the trial court permitted her to testify as an "expert in the area of child psychology and forensic interviewing." Dr. Battle then testified generally about the behavior of child sex-abuse victims, without referring specifically to M. J. Among other things, Dr. Battle testified that there are "so many reasons why kids are afraid" to tell someone about sexual abuse that

> [t]he better question might be why does anybody ever tell. It's really hard to tell somebody these things, particularly if the perpetrator is somebody that the child knows, and almost always the perpetrator is somebody the child knows and somebody the family trusts.

Dr. Battle explained that, in such cases, child victims "don't love the abuse," but "[a]lmost always they love the perpetrator," they "don't want to get the perpetrator in trouble," and they "feel huge responsibility for keeping the family together." For example, "if the

8

perpetrator's a dad or step-dad, [the victims] know if I tell mom, she's either not going to believe me or she's going to be really upset and it's going to be my fault that mom's upset and I don't want to make her upset." Indeed, Dr. Battle testified, older children "typically have an understanding of what might happen after a disclosure," and they find it "a lot easier to deal" with the abuse than creating discord within the family, having the police involved, or potentially going to court and testifying. Furthermore, child victims often feel "really uncomfortable" talking about the abuse: "It's really uncomfortable to talk about sexual stuff, even consensual sexual stuff. And when we talk about non-consensual stuff and with children[—]stuff they don't understand or have the words for[—]that's really, really uncomfortable to them."

(d) The State's last witness, Betsy Escamilla, was a counselor at the middle school M. J. had attended in Hall County. Although Escamilla was not tendered as an expert witness and was not qualified as such by the trial court, she testified that she had associate's degrees in criminal justice and "early childhood

[education]," a bachelor's degree in psychology, and a "master's of science with a specialization in school counseling." She also testified that a "majority of the student population" at the school where she worked was "of Latino background," that she came from a "Latino" "cultural background," having been "born in Mexico but raised in Hall County," and that one of her "passions [was] to work with Latino at-risk students and students in poverty." To that end, she attended conferences and obtained certifications and, as part of earning her degree in psychology, wrote a "senior research paper" on the "prevalence [of incest] among Latino families," with a focus on Hall County.

The prosecutor first asked Escamilla to opine on "Latino culture" about sexual abuse as follows:

> PROSECUTOR: Now, through your research and your work as a school counselor, have you noticed any attitudes in the Latino culture regarding sexual abuse?
> ESCAMILLA: Yes, I have. Besides just growing up in the Latino — the scholarly articles I've read and research in my professional experience working with Latino children who have been exposed or have been victims of sexual abuse, one — there are several factors that are common factors that deal with working — that Latino children

10

experience, and one of them is working — is the Latino culture is a collectivistic family — they value collectivism a lot.

And a lot of factor is the machismo. And . . . another common trend or factor[ ] is the lack of sexual education. Often many of the students that either disclosed or had been victims of sexual abuse say that or have told me —

At that point, Martinez-Arias's counsel lodged hearsay and relevance objections, but the trial court allowed the prosecutor to continue, and the following exchange occurred:

PROSECUTOR: So without saying what other students have told you, I'm asking you about some attitudes you've noticed with the Latino culture and sexual abuse.

I think you spoke about a machismo culture. Can you explain that to the jury?

ESCAMILLA: The machismo culture means — or what children have expressed to me — not expressed, but what I have experienced is in the machismo culture in the traditional Hispanic and more in the Mexican traditional culture, the father in the home is the breadwinner or the man — whoever the role model, it may not be the father, it could be an uncle or grandparent or even the older brother, there is — if there's not a father in the home, is seen as a — as the leader of the home, the one that you have to serve; that many times the mothers or the females are supposed to be submissive to the — to the role — to the male role and the male figure in the home.

Defense counsel again raised a relevance objection, and the prosecutor responded that defense counsel earlier had "explored the traditional roles in the home" with a different witness and that the State was "attempting to develop some of the attitudes that may have been prevalent in the home in which the victim resided."[3] The trial court overruled the relevance objection and stated that "the jury can use the evidence for whatever value, if any, the jury finds in this case."

---

[3] Specifically, A. J. earlier had been asked about his household's dynamic and testified that, while living in Georgia, Cruz and Martinez-Arias were "[s]omewhat strict," but that he and his brother had "more freedoms" than M. J. in the sense of "[g]oing out, hanging out with friends, typical teenage freedoms." On cross-examination, A. J. further testified that his aunt, Cruz, was the primary disciplinarian in the household and that she was more strict with M. J. than with him and his brother, in part because M. J. "was a girl." Asked whether Cruz "differentiated between boys and girls," A. J. responded, "Yes, that's correct, because I seen [sic] how my grandfather raised his kids; girls are girls and boys are boys." Further, A. J. testified that Cruz was "somewhat" the "boss of the house" and that there was a gender divide between the household duties performed by Martinez-Arias and Cruz; for example, Cruz would do most of the grocery shopping, whereas "clean[ing] the outside was mainly the men's job." But, A. J. testified, he and the other children's household duties were divided such that "everyone had a turn at dishes, everyone was responsible for their room, their clothes." A. J. also testified that he often helped Martinez-Arias with side jobs, such as landscaping or fixing cars, while M. J. helped with "traditional female" duties, such as cleaning and cooking. Notably, A. J.'s testimony made no references to ethnicity, and neither party objected to his testimony about household dynamics.

12

The prosecutor again asked Escamilla: "Have you, in your research with Latino victims of sexual abuse, noticed any cultural norms regarding sexual abuse in the Latino culture?" Escamilla responded:

> There's guilt, shame, lack of family support and lack of reporting among the children. And also the support from the family members because of the fear of shame, that is contributing — I stated at the beginning, the values in the Latino Mexican culture — I'm going to continue with the Mexican culture because that's what I have the most experience working with, and that is personally what I have a passion for — but it's the fear of — because of the collectivistic and the family structures, it's really difficult for children to express or even disclose, and when they do disclose, often the times the lack of support from the family for — it's kind of seen as if it happens — and no way am I saying that this is acceptable norm, but it happens — but if it happens, it's something that you don't share, that you keep it quiet, that it is the girl's fault for opening her legs and the boys are just supposed to be that way, they just have urges.
>
> And many of the times when I've worked with girls, that is the guilt and the shame, like it's their fault that they opened their legs, it's their fault they never reported it, it's their fault that it's happening. Because, again, the Mexican culture, in particular, it's taboo — sexual education is a taboo topic among Latinos and a lot more in the Mexican structure, because it's based on religious foundations, as well.

Escamilla then offered extensive testimony about her personal interactions with M. J.  As a school counselor, Escamilla met with M. J. "frequently" and "followed up" about "previous counseling sessions" that M. J. had attended with a different counselor, including in one-on-one meetings with M. J.  In describing her personal observations of M. J.'s personality and demeanor, Escamilla testified, among other things, that M. J. made good grades and was an "extraordinary student," that she "stood out" among other students, and that she "always carried a book in her hand." But, Escamilla said, M. J. was "having a difficult time not being with family, and not growing up with a mom."  Moreover, M. J. was "[q]uiet," "different than a lot of the other seventh grade girls that were trying to get attention," and not the type of student who "would tell you everything immediately."

Escamilla testified that M. J. did not tell her about being sexually abused until after the abuse was reported to law enforcement officials.  When M. J. did talk to Escamilla about the abuse, M. J. was "very emotional, she was crying."  M. J. told

14

Escamilla that Martinez-Arias had been "touching her and doing things to her at night"—that "he had touched her without her permission and it was hurting." Escamilla further testified that M. J. expressed to her that M. J.'s father was dismissive about the abuse: "her father dismissed the fact that it was sexual molestation because there—there had not been any penetration." And M. J. had a "hard time coping" with her father's attitude in that regard. The State concluded its case-in-chief after Escamilla's testimony.

(e) Martinez-Arias's counsel cross-examined M. J. and elicited testimony to support the defense theory that M. J. had a motive to fabricate her story of abuse. Among other things, M. J. acknowledged that, not long before she made the cell-phone recording of the abuse, her brothers got into a "fairly heated" argument with Martinez-Arias. M. J. could not recall the specifics of the argument, but testified that "it started out something small and it blew out of proportion pretty easily." She further testified that Cruz and Martinez-Arias previously had "threatened" to send

M. J. and her brothers to Mexico, although they had never followed through on that threat.

The defense also presented several of its own witnesses—including Cruz, who had married Martinez-Arias after M. J. disclosed the abuse. In sum, Cruz testified that, during the time M. J. lived with them, Cruz did not observe any behavior on the part of M. J. or Martinez-Arias that would cause her to believe that M. J. was sexually abused; for example, Cruz never heard anything in M. J.'s bedroom "that caused [her] concern," and Cruz never saw Martinez-Arias "running out" of M. J.'s bedroom "or seeming like he was trying to hide something." Cruz also testified that she heard the cell phone recording in which M. J. said, "Stop," and that she recalled an occasion where she heard "something like that between [Martinez-Arias] and [M. J.]" In describing this event, however, Cruz testified that Martinez-Arias was trying to confiscate the cell phone from M. J., and again, Cruz did not observe anything inappropriate or unusual at the time; for example, Cruz testified that she saw Martinez-Arias walking out of M. J.'s room with his

clothes on and that M. J. was lying on her bed, "fully clothed," with "her hand under the pillow with the cell phone." Several other witnesses, including members of the church that M. J. frequented with her family, testified that they did not observe anything unusual about M. J.'s behavior around Martinez-Arias and that she in fact called him "Papi" or "Dad."

2. *Procedural History.*

The jury found Martinez-Arias guilty of all three counts; he received a total sentence of life in prison, with 25 years to serve in custody and the remainder on probation. He then filed a motion for new trial, contending (among other things) that the trial court erred when it failed to exclude Escamilla's "expert" testimony about Latino cultural attitudes or norms. He argued that this testimony was irrelevant and that the State failed to disclose Escamilla before trial as an expert witness. The trial court denied Martinez-Arias's motion for new trial, finding that Escamilla was not tendered as an expert witness and that her testimony was "relevant and helpful to understanding the victim-child's behavior in the context of her

17

Latino family," and in particular, her "behavior in failing to disclose for some period of time and the family's negative reaction to her disclosure." Martinez-Arias then appealed.

The Court of Appeals affirmed the trial court's judgment. See *Martinez-Arias*, 356 Ga. App. 423. With regard to relevance, the Court of Appeals determined that Escamilla's testimony "provided context for the several-year delay in the victim's outcry, a relevant issue given the defense's theory that the allegations of abuse were fabricated," and that the "trial court was authorized to conclude that the testimony related to the victim's fear and failure to immediately disclose the abuse, rather than Martinez-Arias's ethnicity." Id. at 425 (citation and punctuation omitted). The Court of Appeals also concluded that "the trial court did not err in finding that [Escamilla's] testimony was admissible as lay opinion evidence, rather than expert testimony." Id. at 426. We granted certiorari to determine whether the admission of Escamilla's testimony about "cultural characteristics of an ethnic group" constituted reversible error.

3. *Escamilla's Generalized Testimony About Mexican and Latino Culture Was Not Relevant.*[4]

Under our Evidence Code, "the term 'relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." OCGA § 24-4-401 ("Rule 401"). Although this relevance standard is a "liberal one," it is "not meaningless or without boundaries." *State v. Stephens*, 310 Ga. 57, 60 (849 SE2d 459) (2020). Any evidence that fails to meet this standard will be barred by OCGA § 24-4-402 ("Rule

---

[4] We note at the outset that the State (represented by the District Attorney's office) argued at trial and in the motion for new trial proceedings that Escamilla's testimony about generalized ethnic and cultural characteristics was relevant, and that the State maintained that position throughout the proceedings before the Court of Appeals, in its response to Martinez-Arias's certiorari petition, and again in its appellate brief to this Court. However, during oral argument (which occurred more than four months after the District Attorney's brief was filed in this Court), and with no prior notice to this Court or to Martinez-Arias's counsel, the District Attorney—appearing on behalf of the State—changed position on the relevance of Escamilla's testimony. To that end, the State at oral argument conceded that Escamilla's generalized testimony was not relevant, but argued that the trial court's error in admitting it was harmless. We understand that circumstances may arise that necessitate or otherwise lead to a change in a party's legal position, and we appreciate the State's forthrightness in this regard. We remind litigants, however, that in such circumstances, parties should notify the Court and the opposing counsel as soon as possible to provide adequate time to prepare for, or respond to, new or changed positions.

19

402"), which provides, without exception, that "[e]vidence which is not relevant shall not be admissible." See *State v. Mondor*, 306 Ga. 338, 350 (830 SE2d 206) (2019) (citation and punctuation omitted). A trial court's decision whether to admit or exclude evidence is reviewed on appeal for an abuse of discretion. *Lyons v. State*, 309 Ga. 15, 21 (843 SE2d 825) (2020).

As an initial matter, it bears noting that the majority of Escamilla's testimony pertained to her personal interactions with M. J. in Escamilla's role as M. J.'s school counselor—both before and after M. J. disclosed the abuse she suffered—and to the rational inferences Escamilla perceived from those interactions. See OCGA § 24-7-701 (stating that lay witness testimony "in the form of opinions or inferences" must, among other things, be "[r]ationally based on the perception of the witness"). Although the trial court made no express findings on the relevance of this aspect of Escamilla's testimony, we have no trouble concluding that the testimony was provided as a lay opinion and that it was relevant to

corroborating the State's theory about M. J.'s actions both before and after her outcry.

We cannot say the same about Escamilla's generalized testimony about Mexican and Latino culture.[5]  Putting aside the question of whether Escamilla purported to testify as an expert witness when she opined on Mexican and Latino culture,[6] we conclude that her generalized testimony in this regard was not relevant and was thus inadmissible.

We begin our analysis of this testimony by identifying the "fact that is of consequence" under Rule 401.  Both the trial court and the

---

[5] Escamilla was asked specifically about "Latino culture," and she expressly mentioned "Latino culture." Escamilla also referred to "traditional Hispanic" culture and "Mexican traditional culture," and she appeared to focus on "Mexican culture because that's what [she had] the most experience working with" and had "a passion for."  For ease of reference, unless expressly stated otherwise, any further mention of "Escamilla's testimony" in this opinion refers to her generalized testimony about Mexican and Latino culture—not to her testimony about her personal interactions with M. J.

[6] Given our conclusion that follows in this division, we need not decide whether Escamilla's testimony was properly admitted as lay opinion.  Suffice it to say, however, that some of us have concerns about whether the type of generalized testimony Escamilla offered about Mexican and Latino culture— even if it were relevant—could be offered properly by a lay person, as opposed to by an expert who is qualified to opine on such topics.

Court of Appeals concluded that Escamilla's testimony was intended to explain M. J.'s delayed outcry—that is, to show that her years-long delay in disclosing the abuse she suffered was not the result of fabrication, but rather was "related to the victim's fear." *Martinez-Arias*, 356 Ga. App. at 425. To that limited extent, we agree with the trial court and the Court of Appeals that, if Escamilla's testimony were relevant at all, it would be for the limited purpose of "provid[ing] context for the several-year delay in the victim's outcry." Id.[7]

But we reach a different conclusion about whether Escamilla's testimony about Mexican and Latino culture was actually relevant, and conclude that it was not because it had no tendency to make the "fact of consequence"—the State's theory that M. J.'s delayed outcry

---

[7] The State did not argue, either in the trial court or on appeal, that Escamilla's testimony was relevant to explain *Martinez-Arias's* behavior—to show, for example, that the prevalence of "machismo" in Latino culture made it more likely that Martinez-Arias sexually abused M. J., or that he had a propensity to sexually abuse children because of his ethnicity. And, as explained below in Division 4, we do not believe that Escamilla's testimony reasonably could be interpreted as such. Were it otherwise, Escamilla's testimony could be problematic for a host of other reasons beyond just lack of relevance. We need not enumerate those reasons today, however, because that situation is not presented here.

was not the result of fabrication—any more probable or less probable than it would have been without the testimony. See OCGA § 24-4-401. In other words, it indicated nothing at all about M. J.'s specific motivations about when and why she reported her abuse and provided no basis for the jury to make any reasonable inferences about M. J.'s behavior; the testimony bore no relationship to M. J. or her specific actions. See Fed. R. Evid. 401, Advisory Committee Notes ("Relevancy is not an inherent characteristic of any item of evidence but exists only as a relation between an item of evidence and a matter properly provable in the case. . . . Whether the relationship exists depends upon principles evolved by experience or science, applied logically to the situation at hand."). See also, e.g., *Luxottica Group, S.p.A. v. Airport Mini Mall, LLC*, 932 F3d 1303, 1320 (11th Cir. 2019) (concluding that certain evidence was relevant because "the jury reasonably could have inferred" a consequential fact from that evidence).[8]

---

[8] Because OCGA § 24-4-401 is materially identical to Federal Rule of Evidence 401, in interpreting OCGA § 24-4-401, "we properly look to the

To begin, Escamilla's testimony about the ethnic and cultural attitudes she had experienced was so broad and generalized that we cannot say it would indicate to the jury whether those attitudes—even assuming for the sake of argument their accuracy—applied to the members of M. J.'s household. That is particularly true with respect to Escamilla's testimony about "collectivism" ("Latino culture is a collectivistic family") and "machismo" ("a lot of factor [sic] is the machismo") in Latino culture. Likewise, Escamilla's generalized comments such as "many times the mothers or the females are supposed to be submissive" and "another common trend or factor[ ] is the lack of sexual education" provided no basis for the jury to be able to determine the prevalence of those attitudes and whether the members of M. J.'s household shared them, again

---

decisions of the federal appellate courts — particularly the United States Supreme Court and the Eleventh Circuit — interpreting [federal Rule 401], rather than to cases discussing relevance under the old [Georgia] Evidence Code." *Smith v. State*, 299 Ga. 424, 429-430 (788 SE2d 433) (2016). Moreover, "although Advisory Committee Notes are not binding precedent and cannot change the plain meaning of the law or rules, they are highly persuasive." *State v. Almanza*, 304 Ga. 553, 559 n.6 (820 SE2d 1) (2018).

assuming only for the sake of argument that Escamilla's testimony was even accurate.

What is more, neither M. J. nor any member of her household testified about their own ethnic or cultural identity, and it is not clear to us that, just because M. J. and at least some members of her household had lived in Mexico at some point or had family living in Mexico, the jury reasonably could infer that the generalized characterizations Escamilla offered about Mexican or Latino culture applied to M. J. or the members of her household living in Georgia.[9] Given this lack of foundation, we do not see how a jury reasonably could infer from Escamilla's testimony that M. J.'s decision about the timing of her outcry—including that she allegedly suffered nearly three years of abuse before revealing it—was affected (let alone motivated) by the cultural attitudes Escamilla testified to having observed and studied. See *United States v. Street*, 548 F3d

---

[9] The State also argued at trial that Escamilla's testimony was relevant because it related to defense counsel's cross-examination of A.J. about "the traditional roles in [M.J.'s] home." But A.J.'s testimony in that regard—as summarized above in footnote 3—was about his household's dynamic and made no reference to ethnicity.

25

618, 631-633 (8th Cir. 2008) (detective's testimony about general gang culture and attitudes, including a purported "tradition of misogynistic, hardened outlaws," was not relevant, in part because this evidence had "no discernible connection to the murder charges [the defendant] faced, and [the defendant] was not a gang member nor ever had been"); *United States v. Hall*, 653 F2d 1002, 1006 (5th Cir. 1981) (testimony from a "quasi-expert" about general investigative procedures of the Drug Enforcement Administration was not relevant because he "testified to no facts bearing on any manner on the prosecution of [the defendant] or on the investigation leading to that prosecution"). See also *Jinro America, Inc. v. Secure Investments, Inc.*, 266 F3d 993, 1011 (9th Cir. 2001) (Wallace, J., concurring) (in civil case, testimony about the behavior and attitudes of "Korean businessmen" in general was not relevant "to show that this particular Korean businessman (or company) is that type of a businessman or acted that way in this specific contractual

arrangement"; "it shed[ ] no light on [the defendant company's]

activities in this case").[10]

---

[10] We acknowledge that federal courts have reached different conclusions when analyzing the often-complex question of whether evidence about culture or ethnicity is relevant under Federal Rule of Evidence 401. Compare, e.g., *United States v. Cabrera*, 222 F3d 590, 596 (9th Cir. 2000) (holding that, in a drug prosecution, "[m]ost of [the investigating officer]'s references to Cubans were not relevant under Rules 401 and 402," that his "testimony about how Cubans package their drugs may have been relevant to other aspects of the case," and that the packaging evidence was in any event inadmissible under Federal Rule of Evidence 403); *United States v. Doe*, 903 F2d 16, 20-21 (D.C. Cir. 1990) (expert testimony that "the retail [drug] market has been taken over basically by Jamaicans" and that local drug dealers "in many cases" were replaced by "Jamaicans" was irrelevant because this testimony "hardly described for the jury the modus operandi of drug dealers, Jamaican or otherwise," and could not have "provided legitimate assistance to the jurors in determining whether appellants committed the offenses charged"; and although other aspects of his testimony that referenced ethnicity were "arguably relevant," a Rule 403 analysis should have been conducted before the trial court admitted it (punctuation omitted)) with *Dang Vang v. Vang Xiong X. Toyed*, 944 F2d 476, 481-482 (9th Cir. 1991) (in case brought under 42 USC § 1983, trial court did not abuse its discretion in deciding that an expert witness's "general explanation of Hmong culture and the role of women in that culture" was relevant "to assist the trier of fact to understand certain behavior of the parties . . . that might otherwise be confusing"); *United States v. Khan*, 787 F2d 28, 34 (2d Cir. 1986) (expert testimony about "the price of heroin in Pakistan," the practice of "Pakistani [drug] dealers" of "advancing heroin without cost," and "the nature of dress favored by Pakistani dealers" was relevant to rebut defendant's arguments to the jury and to show that the defendant "did not need a large sum of money to deal in large amounts of heroin in Pakistan" and that, even if the defendant "had made a great deal of money in the heroin trade, it would not necessarily show from the manner of his dress"). See also, e.g., *Commonwealth v. Tirado*, 375 A2d 336, 337-338 (Pa. 1977) (holding that a police officer's generalized testimony about purported "machismo" values among "Puerto Rican males" introduced "irrelevant material [that] prejudiced [the defendant]" and granting a new trial, but doing so without conducting a harmless-error analysis).

In sum, Escamilla's testimony about Mexican and Latino culture was not relevant to explain M. J.'s behavior because Escamilla's testimony shed no light on whether such generalized characterizations applied to M. J. or members of her household, and did not make it more or less probable that M. J.'s delay in disclosing her abuse was a sign of fabrication. Accordingly, Escamilla's testimony did not meet the Rule 401 standard for relevance and was therefore inadmissible. See OCGA §§ 24-4-401, 24-4-402; *State v. Stephens*, 310 Ga. 57, 60 (849 SE2d 459) (2020) ("[T]he trial court did not abuse its discretion in determining that the [evidence in question] would require the jury to stack too many increasingly strained inferences to find it relevant to the issue for which it was offered."); *Roberts v. State*, 305 Ga. 257, 262 (824 SE2d 326) (2019) (certain evidence was irrelevant under Rule 401 because "nothing more than speculation and conjecture" connected that evidence to the fact at issue); *United States v. Reagan*, 725 F3d 471, 489 (5th Cir. 2013) (trial court did not err in determining that connection

28

between the evidence and the purpose for which it was offered was

"far too tenuous" to establish relevance).[11]

Finally, we caution that Georgia courts should assess the

relevance of cultural or ethnic evidence based on the specific

testimony in question and on the fact that such evidence is supposed

to make more (or less) probable, viewing such evidence in the context

of the record before the court in that particular case.    See

---

[11] We note that in some cases, federal courts have decided the admissibility of cultural or ethnic evidence under Federal Rule of Evidence 403, which allows courts to "exclude relevant evidence if its probative value is substantially outweighed" by "a danger of . . . unfair prejudice."  See, e.g., *United States v. Ramirez-Fuentes*, 703 F3d 1038, 1046 (7th Cir. 2013) (suggesting that federal agent's testimony about "Mexican methamphetamine" was not relevant, but even if it were "at all relevant under [Federal Rule of Evidence] 401, it should have been excluded under Rule 403 because of the danger of unfair prejudice inherent in its admission" and denying defendant's request for a new trial because the agent's testimony did not constitute plain error); *United States v. Nobari*, 574 F3d 1065, 1074-1075 (9th Cir. 2009) (holding that "ethnic generalization testimony" about "Middle Easterners" and "Mexicans" was "relevant under Federal Rule of Evidence 401, if only to a small degree," to explain a certain conversation, but should have been excluded because "the minimal probative value of the evidence was substantially outweighed by the danger of unfair prejudice," and also concluding that the error was harmless beyond a reasonable doubt); *Jinro America, Inc.*, 266 F3d at 1002, 1006 (in civil case, holding, without ruling on relevance, that a private investigator's generalized testimony "about Korean business attitudes and behavior" was inadmissible under Federal Rule of Evidence 403).

Because we have determined that Escamilla's testimony in this case was not relevant, we need not engage in a Rule 403 analysis.  See OCGA § 24-4-403 ("Relevant evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . .").

*Sprint / United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 387 (128 SCt 1140, 170 LE2d 1) (2008) (explaining that relevance under Rule 401 is "determined in the context of the facts and arguments in a particular case, and thus [is] generally not amenable to broad *per se* rules"); *United States v. Bradley*, 644 F3d 1213, 1271 (11th Cir. 2011) ("[The] determination of whether the evidence is relevant under Federal Rule of Evidence 401 . . . must turn on the facts of each specific case."). Accordingly, we express no opinion as to whether testimony referencing culture or ethnicity—including testimony that potentially could invoke cultural or ethnic stereotypes (whether positive or negative)—ever could be relevant or admissible in other cases; we conclude only that Escamilla's testimony about Mexican or Latino culture, when considered in the context of the other evidence presented at Martinez-Arias's trial, was not relevant and that the trial court abused its discretion by admitting it here.[12]

---

[12] In *Nguyen v. State*, 271 Ga. 475 (520 SE2d 907) (1999), we held that the trial court did not abuse its discretion under Georgia's old Evidence Code

4. *The Admission of Escamilla's Testimony Was Harmless*

Although the trial court abused its discretion when it admitted Escamilla's generalized testimony about Mexican and Latino culture, our inquiry does not end there; we must also evaluate whether the evidentiary error was harmless. To that end, "even where an abuse of discretion is shown, there are no grounds for reversal if the error did not affect a substantial right, and thus

when it ruled that certain cultural evidence—expert testimony about a criminal defendant's "Vietnamese religious beliefs, values[,] and cultural traditions in support of her justification defense"—was not admissible, but we disapproved the Court of Appeals's opinion "to the extent it h[eld] that evidence of a criminal defendant's cultural background is never relevant." Id. at 476-477. In that case, this Court noted that it could "envision rare situations in which such evidence might be relevant to assist the jury in understanding why an accused acted in the way he or she did" and cited as a hypothetical example "a situation in which an accused, based on the cultural beliefs, value[s, ] and traditions of his or her family, friends and associates, might reasonably believe imminent physical harm would be inflicted on the accused by the others consistent with that cultural background." Id. at 476 & n.1. Like the Court today, however, this Court in *Nguyen* concluded "that situation [was] not present in [that] case." Id. at 476. See also *Lee v. State*, 262 Ga. 593, 594 (423 SE2d 249) (1992) (under old Evidence Code, holding that the trial court did not err by "refusing to allow an expert in Chinese culture to testify" in a case where the "defendant maintained that he fired the first shot [that killed the victim] accidentally, while the second shot was in self-defense" because the proffered expert testimony was not relevant; the defenses raised "were matters the jury was able to resolve," and "evidence of the effects of Chinese culture on the defendant in firing the shots would not have aided the jury in its search for truth," but noting that "the defendant was permitted to testify to many aspects of Chinese culture" even apart from the testimony he sought to elicit from his expert).

harm, the defendant." *Neuman v. State*, 311 Ga. 83, 91 (856 SE2d 289) (2021) (citation and punctuation omitted). See also OCGA § 24-1-103 (a) ("Error shall not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"). "The test for determining nonconstitutional harmless error is whether it is highly probable that the error did not contribute to the verdict." *Cook v. State,* 312 Ga. 299 (862 SE2d 510) (2021) (citation and punctuation omitted). "In determining whether the error was harmless, we review the record de novo and weigh the evidence as we would expect reasonable jurors to have done so." *Kirby v. State*, 304 Ga. 472, 478 (819 SE2d 468) (2018) (citation and punctuation omitted). Applying that standard, we conclude that the erroneous admission of Escamilla's irrelevant testimony in violation of Rule 402 was harmless, and as a result, the error does not warrant reversal.

Martinez-Arias essentially contends that Escamilla's testimony was harmful because it provoked "ethnic bias" against Martinez-Arias in the jurors' minds. Specifically, he argues on

appeal that the portion of Escamilla's testimony in which she stated that "boys are just supposed to be that way" and that they "have urges" invoked "negative ethnic stereotypes" about males of Mexican descent, implying that they are "possessed of prurient urges toward their servile children" and are "just supposed to be that way."

We disagree with Martinez-Arias's characterization of Escamilla's testimony. Viewed appropriately in context as a reasonable juror would, it is evident that Escamilla was describing her personal observations about cultural attitudes within a subset of families in which sexual abuse has occurred—and that she was not describing characteristics of Latino men more generally:

> PROSECUTOR: Have you, *in your research with Latino victims of sexual abuse*, noticed any cultural norms regarding sexual abuse in the Latino culture?
> ESCAMILLA: . . . no way am I saying that [child abuse] is acceptable norm, but it happens — but if it happens, it's something that you don't share, that you keep it quiet, that it is the girl's fault for opening her legs and the boys are just supposed to be that way, they just have urges.

(Emphasis supplied.) And Escamilla's other statements—including those about alleged "common" attitudes or "trend[s]" within Mexican

33

or Latino culture—did not imply to the jury that Mexican or Latino males were more likely to sexually abuse children than non-Latino males, or that Martinez-Arias's background made it more likely that he sexually abused M. J.  Nor, as discussed further below, did the State ever argue that the jury should infer such a conclusion from Escamilla's testimony.  In short, the evidence does not support Martinez-Arias's argument that Escamilla's testimony seeded in the minds of the jurors the bias that he alleges.  See *Kirby*, 304 Ga. at 478.[13]

---

[13] As mentioned above in Division 1 (d), in overruling the defense's relevance objection to Escamilla's testimony, the trial court stated in the presence of the jury that "the jury can use the evidence for whatever value, if any, the jury finds in this case."  Martinez-Arias contends that this statement amplified the harm he suffered from Escamilla's testimony.  But even if the trial court erred in making this statement (and we express no opinion on this point), we conclude that it is highly unlikely that the statement contributed to the jury's verdict.  The trial court's statement did not tell the jury that it *must* assign value to Escamilla's testimony; to the contrary, it contemplated that the jury might not deem the testimony valuable at all ("the evidence for *whatever value, if any*") (emphasis supplied).  Moreover, in its final instructions to the jury, the trial court stated, among other things: "You are not required to accept the testimony of any witnesses, expert or otherwise.  Testimony of an expert, like that of all witnesses, is to be given only such weight and credit as you think it is properly entitled to receive."

Martinez-Arias also contends that the evidence presented against him at trial was not overwhelming and "hinged on M. J.'s credibility." But even if we accept for purposes of argument Martinez-Arias's assessment of the evidence, none of Escamilla's generalized testimony about cultural attitudes, when viewed in context, either bolstered M. J.'s credibility or incriminated Martinez-Arias. See *Kirby*, 304 Ga. at 478; *Adkins v. State*, 301 Ga. 153, 158 (800 SE2d 341) (2017) ("We consider the context of the testimony in evaluating whether its admission was harmless.").

To that end, the main substantive point of the testimony Escamilla offered to explain M. J.'s behavior as it related to her abuse—i.e., her delayed outcry—largely overlapped with the testimony of Dr. Battle, a licensed psychologist who had experience conducting forensic interviews of abused children and who (unlike Escamilla) was tendered and qualified to provide expert testimony at trial. As summarized above, Dr. Battle provided a comprehensive and detailed explanation of why child victims of sexual abuse might have difficulty disclosing their abuse. Indeed, Dr. Battle's expert

35

testimony—which was based on extensive education and experience and devoid of references to ethnicity or cultural stereotypes—provided the same substantive information about child sex-abuse victims that Escamilla attempted to explain through generalized characterizations of ethnicity and cultural attitudes. Escamilla's testimony was therefore largely cumulative of Dr. Battle's in this regard. See *Puckett v. State*, 303 Ga. 719, 722 (814 SE2d 726) (2018) (error in the admission of certain testimony was harmless, in part because the testimony was "largely cumulative" of other "unobjected-to testimony").

Furthermore, apart from Escamilla's testimony, the State did not otherwise rely on or refer to culture or ethnicity to support its case against Martinez-Arias. Indeed, M. J. did not reference her ethnic or cultural background when the prosecutor asked why she did not disclose her abuse earlier; she instead testified that she did not want Martinez-Arias and Cruz to be separated, that she "didn't know if anyone would believe [her]," and that she was "scared" of losing her brothers—sentiments similar to the ones Dr. Battle

36

explained as common among child sex-abuse victims and which could result in delayed reports of abuse.

Finally, neither the substance nor the effect of Escamilla's irrelevant testimony was amplified during the trial. Escamilla was the last witness to testify on behalf of the State, and none of the State's earlier witnesses were questioned about or repeated Escamilla's testimony; Martinez-Arias's counsel likewise did not ask any of the defense witnesses about Escamilla's testimony or about cultural characteristics more generally. Moreover, in closing arguments, the prosecutor did not reference Mexican or Latino culture or ethnicity and did not mention Escamilla's testimony at all—though the prosecutor did mention Dr. Battle's. Instead, the prosecutor heavily emphasized the evidence presented at trial that supported M. J.'s credibility, telling the jury, among other things, that M. J. "sobbed for two hours in front of you, trying, trying to tell you what happened to her" and that she had no motive to lie: "Why would she lie? What does she stand to gain? She stands to gain nothing but embarrassment[,] upset, depression." See *Taylor v.*

*State*, 306 Ga. 277, 283 (830 SE2d 90) (2019) (error in admitting certain evidence was harmless, in part because there was "no contention that the State mentioned or relied upon the [evidence] during its closing argument to the jury").

For these reasons, it is highly unlikely that—based on the record in this case—Escamilla's erroneously admitted testimony contributed to the jury's verdict. See *Kirby*, 304 Ga. at 487 (error in admitting certain evidence was harmless because it was "easily offset by the other compelling evidence" against defendant); *Morgan v. State*, 307 Ga. 889, 898 (838 SE2d 878) (2020) (erroneously admitted evidence was harmless where it "played a minor role in both the State's case and [defendant]'s theory of defense" and there was "no likelihood that the jury would have weighed the case differently had the trial court excluded" the evidence in question).

To conclude, the trial court and the Court of Appeals erred when they held that Escamilla's testimony was relevant. But because the Court of Appeals's ultimate judgment affirming Martinez-Arias's convictions was correct, we affirm. See *Nordahl v.*

*State*, 306 Ga. 15, 27 (829 SE2d 99) (2019) (affirming the judgment of the Court of Appeals under the "right-for-any-reason doctrine").

*Judgment affirmed. All the Justices concur, except Ellington and LaGrua, JJ., who concur specially, and Peterson, J., not participating.*

S21G0150. MARTINEZ-ARIAS v. THE STATE.

LAGRUA, Justice, concurring specially.

With regard to footnote 4 of the majority opinion, I concur that when circumstances arise that necessitate a change in a party's legal position, parties should notify the Court and opposing counsel as soon as possible to allow time for preparation and response to these new or changed positions. And, here, the State should have advised opposing counsel that the State was changing its position before oral argument, particularly because opposing counsel utilized the entirety of his allotted time without the benefit of that information. Consequently, the State was admonished by the Court on more than one occasion, and the State was contrite in apologizing to the Court and acknowledging its error. However, I am concerned that the inclusion of this footnote in the majority opinion may result in unintended consequences.

Litigants may occasionally realize that their position has become tenuous — either because they have retained new counsel

40

or because the law or other circumstances have changed — and they may fail to timely notify the Court and opposing counsel before the commencement of oral argument. But, emphasizing their mistake again in an opinion may discourage future litigants who recognize, too late, that they need to change their position or concede an issue on appeal. Instead, I want to empower litigants to exercise candor and professionalism with the Court when necessity warrants it.

I am authorized to state that Justice Ellington joins in this special concurrence.

Decided February 15, 2022.

Certiorari to the Court of Appeals of Georgia — 356 Ga. App. 423.

*H. Bradford Morris, Matthew G. Leipold*, for appellant.

*Lee Darragh, District Attorney, Anna V. Fowler, Kelley M. Robertson, Assistant District Attorneys*, for appellee.

*The Sonoda Law Firm, Kate A. Skeehan; Wosnik Law, Peter J. Wosnik*, amici curiae.