*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

DISTRICT OF COLUMBIA COURT OF APPEALS

No. 19-CF-0818

DAGOBERTO C. MACHADO, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
2017-CF1-012250

(Hon. Craig Iscoe, Trial Judge)

(Argued February 3, 2022             Decided October 24, 2024)

*Sean Day* for appellant.

*Bryan Han*, Assistant United States Attorney, with whom *Channing D. Phillips*, Acting United States Attorney at the time, and *Elizabeth Trosman* and *John P. Mannarino*, Assistant United States Attorneys, were on the brief, for appellee.

Before BECKWITH and DEAHL, *Associate Judges*, and GLICKMAN,[*] *Senior Judge*.

BECKWITH, *Associate Judge*: A jury convicted Dagoberto Machado of

---

[*] Senior Judge Fisher was originally assigned to this case. Following Judge Fisher's retirement, effective August 22, 2024, Judge Glickman was assigned to take his place on the panel.

multiple offenses related to the inappropriate touching of I.A., the young niece of Mr. Machado's girlfriend.[1]  Mr. Machado argues that the trial court erred by admitting expert evidence about the "prescription of machismo" in "the Latino culture."  For the reasons below, we agree that the court should have excluded this testimony and that its admission prejudiced Mr. Machado.  We therefore reverse Mr. Machado's convictions. [2]

## I.

This case involves allegations that Mr. Machado sexually abused I.A. while I.A. was staying with Mr. Machado and his girlfriend—I.A.'s aunt—during the summers of 2016 and 2017.[3]  At trial, I.A. testified that although she lived in Florida with her mother, she regularly visited her father in D.C. during summer breaks, where she sometimes stayed with her aunt's family.  According to I.A., the abuse began in 2016, when Mr. Machado touched her "private part" over her swimsuit during a family outing to a public pool.  She did not tell anyone at the time about the

---

[1] The specific charges were four counts of second-degree child sexual abuse with aggravating circumstances, one count of misdemeanor child sexual abuse with aggravating circumstances, and one count of simple assault.

[2] Because of our disposition, we need not address Mr. Machado's arguments about merger.  *See Johnson v. United States*, 50 A.3d 1050, 1051 n.2 (D.C. 2012).

[3] At the time of trial, in 2019, I.A. was fourteen years old.  She was eleven years old when the alleged abuse began in 2016.

touching because she was unsure whether it was intentional, but by the time of trial, she was certain that it was "on purpose."

When I.A. returned to the District the following summer, she again stayed with her aunt. She testified that while she was there, Mr. Machado slid his hand up her inner thigh several times as she played with the family dog.[4] She still did not tell anyone about these touches because she "didn't know how to say it" and she worried that telling people would affect her relationship with her family. She described other interactions as well: on two occasions Mr. Machado hugged her when she got out of the shower while she was wearing only a towel. Then one night, Mr. Machado grabbed her buttock in the kitchen and later came into her room and touched her breasts. After Mr. Machado left her room, his son came in, saw that I.A. was crying, and brought his dad (Mr. Machado) and later his mother (I.A.'s aunt) to the room. I.A. and her aunt both testified that after hearing I.A.'s account of what happened, her aunt stayed the night with I.A. and then the two of them told I.A.'s father later that weekend. I.A.'s father confirmed this account and testified that he and I.A. spoke to the police.

---

[4] I.A.'s aunt testified that family members played a game with the dog that involved touching each other's legs, though she clarified that the game did not require touching the inside of people's thighs.

Before the jury heard any of this testimony, the government called Dr. Stephanie Wolf, a child psychologist, "to help [the jury] put all of what [they would] hear about this family in context." Mr. Machado objected to Dr. Wolf's testimony and qualification as an expert, both before and during trial. He argued that because Dr. Wolf's dissertation contained a "suggestion" that there were "higher rates of sexual abuse prevalent among Latino female adolescents," her testimony could prejudice Mr. Machado, a Latino man accused of sexually abusing a Latina adolescent. The trial court overruled Mr. Machado's objections and qualified Dr. Wolf as an expert witness with specialized knowledge on "the patterns of child sexual abuse, disclosure of child sexual abuse, symptoms of child sexual abuse, and the clinical needs of victims of child sexual abuse."

During direct examination, the government asked Dr. Wolf about the barriers in "the social world generally, that would impede somebody—a child from disclosing right away?" Dr. Wolf responded that "[t]here's often kind of cultural norms that come into play, and so how whatever that child's culture or ethnicity and kind of communities they're involved in, how they view sexuality, how they view abuse, how they view the roles of males and females" can all come into play because "different cultures define abuse differently" and those definitions can inform "whether or not the child—you know, if they're going to give a disclosure, what that might mean for them and what even they use to talk about it." The government then

asked for an example as to how "different cultures differ as to sort of what constitutes abuse," Dr. Wolf began speaking about Latino culture, and Mr. Machado's counsel objected. The trial court overruled the objection, but also confirmed with Dr. Wolf that she was "speaking generally about Latino culture" and that she had "no knowledge of this case."[5] Dr. Wolf went on to testify that within "Latino culture" she sometimes saw "a prescription of machismo and where men have kind of a higher—or different standing within that culture." This "higher standing" "may impact how sexuality is being viewed and kind of what men are allowed to do sexually and how a woman perhaps is—needs to sometimes succumb to a man's demands."

After the government rested, the defense called one witness, I.A.'s grandfather, who testified that I.A. had come to see Mr. Machado at work after the alleged onset of abuse, which counsel later argued was inconsistent with the government's theory that Mr. Machado was "menacing" I.A. The jury found Mr. Machado guilty on all counts.

---

[5] Separate from this colloquy, Dr. Wolf testified that she had not reviewed any materials or interviewed any witnesses specific to this case.

## II.

Quoting *Buck v. Davis*, 580 U.S. 100, 121 (2017), Mr. Machado argues that Dr. Wolf's testimony about Latino culture "appealed to a powerful racial stereotype" and that its admission risked infecting the jury's verdict with racial bias.[6] We review a trial court's admission or exclusion of expert[7] testimony for an abuse of discretion. *Benn v. United States*, 978 A.2d 1257, 1273 (D.C. 2009).

Expert evidence may be admitted where, among other things, the risk of unfair prejudice does not "substantially outweigh[]" the evidence's probative value. *Motorola Inc. v. Murray*, 147 A.3d 751, 754 (D.C. 2016); *see also Johnson v. United*

---

[6] Mr. Machado refers to Dr. Wolf's testimony about Latino and Hispanic people as testimony about race, while the government describes it as testimony about culture. Although "Latino" and "Hispanic" are best described as ethnic categories, we do not consider legally significant the label used to describe the testimony. Other courts have described bias against Hispanic defendants as racial, ethnic, or cultural bias without giving much import to the specific label adopted. *See Pena-Rodriguez v. Colorado*, 580 U.S. 206, 214-15 (2017) (referring to bias against Hispanic defendant as a racial bias while noting that Hispanic identity may also be referred to as ethnicity); *Martinez-Arias v. State*, 869 S.E.2d 501 (Ga. 2022) (referring to testimony about Hispanic or Mexican families as testimony about ethnicity and culture).

[7] Mr. Machado contends that separate and apart from the relevance of Dr. Wolf's observations, she was not qualified to testify as an expert regarding Latino culture. The government argues that Dr. Wolf was qualified to opine on cultural barriers based on her experience treating child sex abuse victims and researching her dissertation, which examined whether "there was a difference based on culture, ethnicity, and race" in child trauma and the symptoms of child trauma. In light of our disposition, we need not resolve this question and we presume without deciding that Dr. Wolf was qualified.

*States*, 683 A.2d 1087, 1099 (D.C. 1996) ("announc[ing] that [this court] will follow FRE 403," the federal evidentiary rule allowing for the exclusion of relevant evidence that is substantially more prejudicial than probative). To be probative, an item of evidence must "tend to make the existence or nonexistence of a fact more or less probable than would be the case without that evidence." *In re L.C.*, 92 A.3d 290, 297 (D.C. 2014) (quoting *Punch v. United States*, 377 A.2d 1353, 1358 (D.C. 1977)).

Here, the government argues that Dr. Wolf's testimony had probative value because it "helped provide the jury with context to understand I.A.'s delayed reporting." That is true as to some portions of Dr. Wolf's testimony. Her statement that approximately "one out of every four children who have been sexually abused would report right away" and her explanation of "child-specific barriers" that may delay children's reporting of abuse—including a child's age, development, understanding of sexuality, family norms, fear of being believed, and fear of affecting family relationships—all explained for the jury why some delay in I.A.'s reporting was not unusual and therefore was not a reason to discredit her testimony.

But Dr. Wolf's statements that "there's a prescription of machismo" in Latino culture "where men have kind of a higher . . . standing" and "a woman . . . needs to sometimes succumb to a man's demands" had, at most, only a tangential connection

to any barrier that I.A. faced in reporting. She gave this testimony in response to a question about how "different cultures differ as to . . . what constitutes abuse," thus suggesting to the jury that she was speaking more broadly about what a potential perpetrator of abuse may consider acceptable, rather than what a child may do in response to the alleged abuse. And unlike Dr. Wolf's statements about how circumstances specific to childhood might interfere with a child's ability to report abuse, generalized statements about machismo culture "bore no relationship to [I.A.] or her specific actions." *Martinez-Arias*, 869 S.E.2d at 509 (concluding that a witness's generalized testimony about purported aspects of Latino culture was inadmissible). Her testimony about Latino culture did not explain I.A.'s "specific motivations about when and why she reported her abuse and provided no basis for the jury to make any reasonable inferences about [I.A.'s] behavior." *Id.*

The testimony's minimal probative value is substantially outweighed by its unfair prejudice to Mr. Machado. Racial stereotypes that—even unintentionally— "cast[] [the defendant] in the eyes of the jury as a member of a group with values allegedly alien to the rest of society, and therefore imply[] that it is more likely that he committed the crime charged," have no place in a criminal trial. *Commonwealth v. Tirado*, 375 A.2d 336, 338 (Pa. 1977) (holding that expert testimony about machismo among Puerto Rican men "prejudiced appellant" and that "[a]ppeals to racial . . . prejudice are especially incompatible with the concept of a fair trial,

[risking] that reason will be dethroned and that bias and emotion will reign"). Indeed, introducing evidence that encourages jurors to "deploy a dangerous racial stereotype to conclude [a defendant is] guilty" runs contrary to the need to "ensure that our legal system remains capable of coming ever closer to the promise of equal treatment under the law that is so central to a functioning democracy." *Pena-Rodriguez*, 580 U.S. at 224-26.

Appeals to racial bias need not be direct, explicit, or intentional to be unfairly prejudicial. Any statement based on racial assumptions can be "pernicious in its attempt to substitute racial stereotype for evidence, and racial prejudice for reason." *Calhoun v. United States*, 568 U.S. 1206, 1206 (2013) (Sotomayor, J., statement regarding denial of certiorari). Here, Dr. Wolf's testimony suggested to the jury that it should view all subsequent evidence in light of an assumption that, simply because he is a Latino man, Mr. Machado was likely to embrace a "machismo" view about "what men are allowed to do sexually," and when women must "succumb to a man's demands." These statements created a risk that the jury would see Mr. Machado as more likely to have sexually abused his niece simply because of his ethnicity.[8]

---

[8] The government argues that Dr. Wolf properly "generalized her statement . . . by saying that 'a large number of cultures'—not just Latinos—

The government argues that the balance tips the other way—that even if the testimony did unfairly prejudice Mr. Machado, the prejudice did not substantially outweigh the testimony's probative value. Specifically, the government points to two federal appellate cases approving testimony related to practices of particular nations. Neither is persuasive here. In *United States v. Alzanki*—a case about a Kuwaiti couple that forced a Sri Lankan domestic worker into involuntary servitude—the First Circuit, applying plain error review,[9] held that the trial court did not err when it allowed the government to admit evidence about "repressive Kuwaiti customs and practices towards domestic workers." 54 F.3d 994, 1007 (1st Cir. 1995). Unlike the prosecution against Mr. Machado, the government in *Alzanki* introduced evidence about cultural customs and traditions through lay witnesses— not with expert testimony. *Id*. at 1007-08. That difference matters because the

---

have a view of 'machismo' that affects whether a child will disclose abuse." But Dr. Wolf's generalization about multiple cultures came after she linked Latino culture specifically with the view that women should "succumb to a man's demands." Stating that other cultures may also expect women to serve a submissive role does not diminish the fact that her testimony encouraged the jury to view Mr. Machado as more likely to be a perpetrator of sexual assault because he is Latino and I.A. as more likely to be a victim of sexual assault because she is Latina.

[9] Because the trial attorney for Mr. Alzanki did not object to the introduction of testimony about Kuwaiti practices and customs (and instead "sought to capitalize on the very same evidence" by telling the jury "that he should not be convicted since his experiences growing up in Kuwait had never put him on fair notice that his treatment of [the domestic worker] might be considered criminal"), the court reviewed the evidentiary ruling for plain error. *Alzanki*, 54 F.3d at 1007-08.

prejudicial effect of testimony can be "heightened" by "the source of the testimony." *Buck*, 580 U.S. at 121. At the outset of Dr. Wolf's testimony, the jury learned that she had a Ph.D. in child clinical psychology and that she worked as a child psychologist and adjunct professor specializing in treating children who have been sexually and physically abused. This suggested to the jurors that, although they were not bound to accept them, Dr. Wolf's statements were worthy of credence. *See id.*

Moreover, unlike Dr. Wolf's expert testimony about machismo culture, lay testimony in *Alzanki* about how Kuwaiti police "were under orders to shoot undocumented domestic workers who ventured out alone" was "highly probative" because it explained why the victim "—as a former domestic servant in Kuwait— developed a 'special vulnerability' to [defendants'] threats, even though an American domestic worker might not have been placed 'reasonably' in fear thereby." *Alzanki*, 54 F.3d at 1007-08. Likewise, in *Dang Vang v. Vang Xiong X. Toyed*, the other case the government points to, expert testimony explaining that "upon fleeing from Laos, Hmong refugees were reliant on government officials for their needs and would not survive in the United States without government assistance" was highly relevant to explain certain behavior by the victims— including their repeated contact with a government official after he raped them— that the jury might have otherwise found "confusing." 944 F.2d 476, 481 (9th Cir. 1991).

In both *Alzanki* and *Dang Vang*, the testimony in question helped explain the victims' interactions with legal and government institutions, which served either as threats to the victims or as powerful forces that could determine their wellbeing and survival. The testimony therefore contextualized what may have otherwise been puzzling—like the belief that police would shoot domestic workers who left the home or the decision to maintain a relationship with an abuser. But here, Dr. Wolf's testimony about "what men are allowed to do" "within the Latino culture" did not clarify any confusing actions by I.A. To the extent Dr. Wolf's testimony explained why I.A. did not immediately report the alleged abuse, that explanation was provided by Dr. Wolf's testimony about why children in general are often slow to report abuse.

This case is more closely aligned with *Martinez-Arias*, where a guidance counselor testified that "in the Mexican traditional culture, the father in the home is . . . the leader of the home, the one that you have to serve; that many times the mothers or the females are supposed to be submissive to the . . . male figure in the home." 869 S.E.2d at 505. The Georgia Supreme Court held that this testimony should not have been admitted because it "provided no basis for the jury to be able to determine the prevalence of those attitudes and whether the members of [the victim's] household shared them." *Id*. at 509. The same is true here: Dr. Wolf's testimony had almost "no tendency to make [any] 'fact of consequence' . . . any

more probable or less probable than it would have been without the testimony." 869 S.E.2d at 509.

Having concluded the testimony was not relevant, the Georgia Supreme Court did not consider whether the guidance counselor's statements unfairly prejudiced the defendant. *Id.* at 509 n.11. Here, the unfair prejudice of Dr. Wolf's testimony— which primed the jury to see Mr. Machado as a predator because he is Latino and I.A. as a victim because she is Latina—cannot be ignored. *See Pena-Rodriguez*, 580 U.S. at 224 (holding that because bias against "Hispanic persons" raised "unique historical, constitutional, and institutional concerns," the longstanding rule against allowing jurors to impeach a verdict had to yield to allegations that racial bias had substantially affected a juror's vote); *United States v. Rodriguez Cortes*, 949 F.2d 532, 541-42 (1st Cir. 1991) (holding that the trial court abused its discretion in admitting evidence that invited the jury "to believe that if a person is born in Colombia, then he must be involved in drug trafficking"); *United States v. Doe*, 903 F.2d 16, 20 (D.C. Cir. 1990) (holding that the trial court erred in admitting expert testimony "that Jamaicans were taking over the retail drug trade" because it "had no bearing upon any claimed defense or other issue at trial, and was openly allusive in linking the drug charges to appellants solely on the basis of [their] ancestry").

For unique reasons absent in the present case, the Georgia Supreme Court in

*Martinez-Arias* ultimately found the testimony about Mexican culture to be harmless error. Under the nonconstitutional harmless error test,[10] "the burden is on the government to persuade us that 'the judgment was not substantially swayed by the error,' meaning it is 'highly probable' the error did not affect the jury's verdict." *Moore v. United States*, 114 A.3d 646, 658 (D.C. 2015) (quoting *In re L.C.*, 92 A.3d at 299-300). The government did not meet that burden here.

In *Martinez-Arias*, the Georgia Supreme Court gave significant weight to the fact that the government did nothing to amplify the witness's testimony. *Id.* at 513. "[She] was the last witness to testify on behalf of the State" and in closing argument, the government "did not mention [her] testimony at all." *Id.* Meanwhile, the government here framed a significant part of its case against Mr. Machado around Dr. Wolf's testimony. From the get-go, during opening statements, the government told jurors that Dr. Wolf, an "expert psychologist," was going to "help you put all of what you'll hear about this family in context." It then introduced Dr. Wolf as its first witness and used her testimony to color what the subsequent witnesses said. Finally, during closing statements, the government reminded the jury about

---

[10] Mr. Machado argues that the error was of constitutional magnitude and that the standard set forth in *Chapman v. California*, 386 U.S. 18, 24 (1967), applies. Because the error is not harmless even under the "less stringent" standard for nonconstitutional harm, we need not resolve this issue. *See Russell v. United States*, 17 A.3d 581, 588-89 (D.C. 2011).

Dr. Wolf, her expertise, and her testimony. Even if the government did not call back to Dr. Wolf's specific statements about machismo culture, its overall emphasis on her testimony encouraged the jury to think of her as trustworthy. The court in *Martinez-Arias* also concluded that the testimony about Mexican culture was harmless because the witness "was describing her personal observations about cultural attitudes" and not "describing characteristics of Latino men more generally." 869 S.E.2d at 5012. Here, by contrast, Dr. Wolf explicitly stated that she was "speaking generally about Latino culture."

Whether or not "there was enough to support the result" absent the testimony about "machismo" culture, the jury could reasonably have interpreted Dr. Wolf's testimony as inviting ethnicity, culture, or race into its deliberations, and the government's significant reliance on her testimony as giving tacit approval to that improper bias. *See Kotteakos v. United States*, 328 U.S. 750, 765 (1946). "[D]iscrimination on the basis of race, 'odious in all aspects, is especially pernicious in the administration of justice,'" in part because it undermines "the jury's role as 'a vital check against the wrongful exercise of power by the State.'" *Pena-Rodriguez*, 580 U.S. at 208 (first quoting *Rose v. Mitchell*, 443 U.S. 545, 555 (1979), then quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)). This is not to say that evidence or statements about race, culture, or ethnicity may never be admitted during a criminal trial. *See e.g.*, D.C. Code § 22-3701(1A) (defining a "bias-related crime"

as one "that demonstrates an accused's prejudice based on the actual or perceived race, color . . . national origin . . ."). But when deciding whether to admit such testimony, courts must take precautions to minimize "the risk that racial bias may influence a jury's verdict in a criminal case," *Doe*, 903 F.2d at 21, and "to prevent a systemic loss of confidence in jury verdicts," *Pena-Rodriguez*, 580 U.S. at 225. Here, we cannot say that it is highly probable that the erroneously admitted testimony did not play a role in the outcome of Mr. Machado's trial. *See In re L.C.*, 92 A.3d at 299-300. The jury was asked to make a credibility determination and decide if it believed I.A.'s account of what happened. Dr. Wolf's testimony encouraged the jury to find I.A.'s story more believable because she is Latina and Mr. Machado's defense less believable because he is Latino. Under these circumstances, the admission of Dr. Wolf's testimony about "the Latino culture" constituted reversible error.

## III.

For the foregoing reasons, we reverse Dagoberto Machado's convictions and remand for further proceedings consistent with this opinion.

*So ordered.*